In the Matter of the ADOPTION
OF K.A.S.

D.S. and B.R.S., Petitioners
and Appellees,

v.

T.D.K., Respondent and Appellant,

and

Executive Director of North Dakota
Department of Human Services,
Respondent.

Civ. No. 920130.

Supreme Court of North Dakota.

April 27, 1993.

Kenneth L. Dalsted (argued), of Gilje, Greenwood & Dalsted, Jamestown, for petitioners and appellees.

David Boeck (argued), Legal Assistance of North Dakota, Bismarck, for respondent and appellant.

LEVINE, Justice.

We are confronted with the issue of the right of an indigent parent to appointed

counsel in an involuntary termination of parental rights under NDCC Chapter 14–15. T.D.K. ["Tom"],[1] denied the right to appointed counsel below, appeals from a district court judgment which terminated his parental rights to K.A.S. ["Karl"], and granted the petition of D.S. ["Debra"] and B.R.S. ["Brad"] for Brad to adopt Karl. We hold that Tom was entitled to court-appointed counsel in these proceedings to involuntarily terminate his parental rights and we reverse and remand for a new trial.

Tom and Debra were married in 1981. Karl was born to the couple in 1983. Tom and Debra were divorced in 1986 and Debra was awarded custody of Karl. Debra married Brad in 1990. In late 1991, Debra and Brad petitioned the court for an order terminating Tom's parental rights to Karl and allowing Brad to adopt him. The petition alleged that Tom, without justifiable cause, had "failed to make any significant communication with the child," had "failed to exercise ... reasonable visitation rights for a period in excess of one year," and had "failed to provide any support for the child since January, 1990."

After being served with the notice of hearing, Tom wrote to the trial court that he was "categorically opposed to the petition for adoption of my son." He requested that the hearing be transferred from Stutsman County to Cass County because he was "currently incarcerated in Cass County Jail." The hearing was held in Cass County.

In response to the trial court's request as the hearing began, counsel for Debra and Brad submitted a brief on whether Tom was entitled to a court-appointed attorney. Tom told the court that "I wish I could afford an attorney but I am not able to...." The court "assume[d]" that Tom could not afford to hire an attorney, told Tom he could respond to opposing counsel's brief on the right to a court-appointed attorney, and said that he was "fairly certain" he had no obligation to appoint counsel for Tom because the proceedings were brought under the Revised Uniform Adoption Act, NDCC Chapter 14–15, rather than

under the Uniform Juvenile Court Act, NDCC Chapter 27–20. The court did not appoint counsel to represent Tom. During the hearing, Tom attempted to cross-examine witnesses; he testified on his own behalf.

After determining that Debra and Brad had "established the presumption that [Tom] intended to abandon [Karl]," the trial court terminated Tom's parental rights, ruled that Tom's consent to the adoption was unnecessary, and granted the adoption petition. Tom, represented on appeal by Legal Assistance of North Dakota, asserts that the judgment should be reversed because the trial court denied him his right to court-appointed counsel.

I

■ Involuntary termination of parental rights may be accomplished under three separate provisions of our law: (1) the Uniform Juvenile Court Act [see NDCC § 27–20–45]; (2) the Uniform Parentage Act [see NDCC § 14–17–24]; or (3) the Revised Uniform Adoption Act [see NDCC § 14–15–19]. Under the Uniform Juvenile Court Act [Juvenile Court Act], parental rights may be involuntarily terminated if the parent has abandoned the child or if the child is "deprived," as defined by statute. See NDCC § 27–20–44(1). Under the Uniform Parentage Act [Parentage Act], the parental rights of a biological father may be terminated if he fails to appear at the hearing or fails to claim custodial rights to the child. See NDCC § 14–17–24(3) and (4).

■ Under the Revised Uniform Adoption Act [Adoption Act], parental rights may be terminated if any ground exists for termination under the Juvenile Court Act or the Parentage Act; if the child has been abandoned by the parent; if the child is suffering or probably will suffer serious harm because of the misconduct, faults, habits, or physical or mental incapacity of the parent; or, if the parent who does not have custody of the child unreasonably withholds consent to the termination, con-

---

1. All names are pseudonyms.

trary to the best interests of the child. *See* NDCC § 14–15–19(3).

 Both the Juvenile Court Act and the Parentage Act give a party the right to legal counsel at all stages of the proceedings, and require the trial court to appoint counsel for a party who is financially unable to obtain counsel. *See* NDCC §§ 27–20–26 and 14–17–18. The right, if any, to court-appointed counsel for an indigent party is less clear under the Adoption Act. NDCC § 14–15–19(6) is the relevant section:

"6. Before the petition is heard, notice of the hearing thereon and opportunity to be heard must be given the parents of the child, the guardian of the person of the child, the person having legal custody of the child, and, in the discretion of the court, a person appointed to represent any party." [2]

Tom asserts that the trial court's construction of NDCC § 14–15–19(6) as not requiring appointment of counsel, and the court's consequent failure to provide court-appointed counsel to represent an indigent, non-consenting parent in a stepparent adoption proceeding, which can result in the termination of parental rights, violated his federal and state constitutional rights.

## II

Before 1981, the vast majority of state and federal courts which had considered the issue held that the due process clause of the fourteenth amendment to the United States Constitution required appointment of counsel for all indigent parents in state-initiated parental-rights termination proceedings. *See, e.g., Davis v. Page,* 640 F.2d 599 (5th Cir.1981), *vacated on other grounds,* 458 U.S. 1118, 102 S.Ct. 3504, 73 L.Ed.2d 1380 (1982); *Smith v. Edmiston,* 431 F.Supp. 941 (W.D.Tenn.1977); *Shappy v. Knight,* 251 Ark. 943, 475 S.W.2d 704 (1972); *In re Rodriguez,* 34 Cal.App.3d 510, 110 Cal.Rptr. 56 (1973); *Danforth v. State Department of Health and Welfare,* 303 A.2d 794 (Me.1973) [federal and state due process grounds]; *Department of Public Welfare v. J.K.B.,* 379 Mass. 1, 393 N.E.2d 406 (1979); *Reist v. Bay County Circuit Judge,* 396 Mich. 326, 241 N.W.2d 55 (1976); *In Interest of Friesz,* 190 Neb. 347, 208 N.W.2d 259 (1973); *Crist v. New Jersey Div. of Youth & Family Services,* 128 N.J.Super. 402, 320 A.2d 203 (1974), *reversed on other grounds,* 135 N.J.Super. 573, 343 A.2d 815 (1975); *In re B.,* 30 N.Y.2d 352, 334 N.Y.S.2d 133, 285 N.E.2d 288 (1972); *State ex rel. Heller v. Miller,* 61 Ohio St.2d 6, 399 N.E.2d 66 (1980); *Matter of Chad S.,* 580 P.2d 983 (Okl.1978) [federal and state due process and equal protection grounds]; *State v. Jamison,* 251 Or. 114, 444 P.2d 15 (1968); *In re Welfare of Luscier,* 84 Wash.2d 135, 524 P.2d 906 (1974) [federal and state due process

2. A parent may also consent to termination of parental rights in proceedings brought under any of the three acts. In response to this court's decision in *In Interest of D.J.H.,* 401 N.W.2d 694 (N.D.1987), the 1989 Legislature enacted NDCC §§ 27–20–45(5), 14–17–18(2), and 14–15–19.1, which provide court-appointed counsel for a consenting parent who is indigent, if the child is to be placed for adoption by a licensed child-placing agency. *See State ex rel. Niess v. Zillmer,* 449 N.W.2d 812, 815 n. 10 (N.D.1989). Section 14–15–19.1 provides:

"*14–15–19.1. Right to counsel.* A parent who consents to the adoption of a minor, under section 14–15–05, is entitled to legal counsel during all stages of a proceeding to terminate the parent and child relationship under section 14–15–19 if the minor is to be placed for adoption by a child-placing agency licensed under chapter 50–12. The parent may retain counsel of the parent's own choosing and at the parent's own expense, or, if indigent, the parent may request the court to order, upon which the court shall order, that a state's attorney serve as legal counsel to the parent at no cost to the parent. As an alternative to the state's attorney serving as legal counsel to the parent, the state's attorney may request the court to order, upon which the court may order, if a conflict is shown to exist, that other legal counsel services that may be available be provided to the parent at no cost to the parent. These alternative legal counsel services include counsel services for indigent persons. Prior to the termination proceeding held under section 14–15–19, the court or a person designated by the court shall inform the parent of the right to counsel provided by this section."

Because Tom did not consent and Karl is not being placed for adoption by a licensed child-placing agency, the right to court-appointed counsel for an indigent parent afforded by § 14–15–19.1 does not apply in this case.

grounds]; *State ex rel. LeMaster v. Oakley*, 157 W.Va. 590, 203 S.E.2d 140 (1974) [federal and state due process grounds]. At least one court applied the same rationale to require appointment of counsel for an indigent parent when parental rights were being terminated through private adoption proceedings that were not initiated by the state. *See, e.g., In re Adoption of R.I.*, 455 Pa. 29, 312 A.2d 601 (1973). The right to counsel recognized by these courts was later codified in many of the same jurisdictions.

But in 1981, the United States Supreme Court cast real doubt on the validity of these decisions, insofar as they were premised on federal due process grounds. In *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), the Court held that the due process clause of the fourteenth amendment does not require appointment of counsel for indigent parents in every parental-rights termination proceeding.

The Court reasoned that the Constitution generally requires the appointment of counsel for an indigent defendant only in a criminal prosecution involving possible loss of physical liberty, explaining that it is the defendant's interest in personal freedom that "triggers the right to appointed counsel." *Lassiter, supra*, 452 U.S. at 25, 101 S.Ct. at 2158. The Court noted that "as a litigant's interest in personal liberty diminishes, so does his right to appointed counsel." [*Lassiter, supra*, 452 U.S. at 26, 101 S.Ct. at 2159], and said that its precedents

"speak with one voice about what 'fundamental fairness' has meant when the Court has considered the right to appointed counsel, and we thus draw from them the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured." *Lassiter, supra*, 452 U.S. at 26–27, 101 S.Ct. at 2159.

The Court analyzed the three elements from *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), that must be weighed against the presumption that there is no right to appointed counsel when there is no risk of lost liberty: "the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." *Lassiter, supra*, 452 U.S. at 27, 101 S.Ct. at 2159.

In examining the private interests at stake, the *Lassiter* Court underscored the fundamental nature of a parent's rights to nurture and rear his or her child:

"This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 [ (1972) ]." *Lassiter, supra*, 452 U.S. at 27, 101 S.Ct. at 2159–2160.

Despite the fundamental importance of parental rights, the Court found that the weight of the *Eldridge* factors would not always rebut the presumption that the Constitution mandates court-appointed counsel only for indigents who face a jail sentence:

"If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the *Eldridge* factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel. But since the *Eldridge* factors will not always be so distributed, and since 'due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed,' *Gagnon v. Scarpelli*, [411 U.S. 778, 788, 93 S.Ct. 1756, 1762, 36 L.Ed.2d 656 (1973) ], neither can we say that the Constitution requires the appointment of counsel in every parental termination proceeding." *Lassiter, supra*, 452 U.S. at 31–32, 101 S.Ct. at 2162.

Thus, under *Lassiter* and the federal due process clause, an indigent parent

has no automatic right to court-appointed counsel in a parental-rights termination case; rather, a trial court, in the exercise of sound judicial discretion, must decide whether due process requires the appointment of counsel for an indigent parent under the circumstances, subject to review on appeal. *Lassiter, supra,* 452 U.S. at 32, 101 S.Ct. at 2162.

### III

Tom argues that the trial court's failure to appoint counsel for him in these adoption proceedings violated his federal due process rights under *Lassiter.* Alternatively, he asserts that his state constitutional rights to due process and equal protection were violated by the failure to appoint counsel.

■ It is unnecessary for us to determine whether Tom's federal due process rights were violated in this case. We have often recognized that our North Dakota Constitution may afford broader rights than those granted under an equivalent provision of the federal constitution. *See, e.g., State v. Orr,* 375 N.W.2d 171, 178 n. 6 (N.D.1985); *City of Bismarck v. Altevogt,* 353 N.W.2d 760, 766 (N.D.1984); *State v. Matthews,* 216 N.W.2d 90, 99 (N.D.1974). But, it is also unnecessary to decide whether, under these circumstances, our state constitutional due process clause is broader in scope than the federal due process clause interpreted by the *Lassiter* Court. We believe that a construction of NDCC § 14–15–19(6) that would allow, through an adoption proceeding, termination of the parental rights of an indigent parent who has been denied appointment of counsel would run afoul of the equal protection provision of our state constitution.

Long viewed as our state constitutional guarantee of equal protection under the law [*see, e.g., Hanson v. Williams County,* 389 N.W.2d 319, 323 n. 8 (N.D.1986); *State ex rel. Olson v. Maxwell,* 259 N.W.2d 621, 627 (N.D.1977) ], Article I, Section 21 of the North Dakota Constitution says:

> "*Section 21.* No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; *nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens.*" [Emphasis added].

■ A "privilege," as used in similar state constitutional provisions, has been defined as " 'a particular and peculiar benefit or advantage enjoyed by a person, company or class beyond the common advantage of other citizens.' " *Daigh v. Schaffer,* 23 Cal.App.2d 449, 73 P.2d 927, 930 (3rd Dist. 1937) [quoting 5 California Jurisprudence, at p. 740]. *See also Leatherwood v. Hill,* 10 Ariz. 243, 89 P. 521 (1906); *Webster's Third New International Dictionary,* at p. 1805 (1971). Under the Juvenile Court Act, the Parentage Act, and the Adoption Act, the trial court may invoke the state's power to permanently terminate parental rights of a birth parent. Certainly, the impact of the termination of parental rights, the severance of the powerful, intimate and personal relationship between parent and child, is the same under any of the acts. *See, e.g., Schneider v. S.L.M.,* 347 N.W.2d 126, 129 (N.D.1984); *Pritchett v. Executive Dir. of Soc. Serv. Bd.,* 325 N.W.2d 217, 220 (N.D.1982). We believe that allowing an indigent parent an opportunity to receive assistance of appointed counsel to protect parental rights is a "privilege" within the meaning of Article I, Section 21.

But, this "privilege" is not clearly granted under NDCC § 14–15–19(6) "upon the same terms" to indigent parents who face Adoption Act proceedings to terminate their parental rights. It makes no difference to parents whether their parental rights are challenged in a proceeding under the Juvenile Court Act, the Parentage Act, or the Adoption Act. Each challenge threatens presently existing parental rights; each seeks the termination of the parent-child relationship. The ultimate termination of parental rights under any of the acts has been described as "punishment more severe than many criminal sanctions." Annot., *Right of Indigent Parent to Appointed Counsel in Proceeding for*

*Involuntary Termination of Parental Rights*, 80 A.L.R.3d 1141, 1145 (1977). NDCC § 14–15–14(1)(a) specifically says that a final decree of adoption operates "to relieve the natural parents of the adopted individual of all parental rights and responsibilities, and to terminate all legal relationships between the adopted individual and his relatives, including his natural parents, so that the adopted individual thereafter is a stranger to his former relatives for all purposes. . . ." The same grounds justifying termination of parental rights under the Juvenile Court Act and the Parentage Act justify termination of parental rights under the Adoption Act. *See* NDCC § 14–15–19(3); *Matter of Adoption of P.R.D.,* 495 N.W.2d 299, 301 (N.D.1993). Yet, counsel is not provided in Adoption Act proceedings. The Article I, Section 21 language, "upon the same terms," envisions that permissible legislative classifications include similarly situated persons who are subjected to similar treatment under the law. *See, e.g., Johnson v. Hassett,* 217 N.W.2d 771, 774 (N.D.1974); *Horst v. Guy,* 211 N.W.2d 723, 731 (N.D.1973); *State v. E.W. Wylie Co.,* 79 N.D. 471, 58 N.W.2d 76, 84 (1953); *Klein v. Hutton,* 49 N.D. 248, 191 N.W. 485, 489 (1922); *Beleal v. Northern Pac. Ry. Co.,* 15 N.D. 318, 108 N.W. 33, 35 (1906).

█ We do not mean to suggest that a "privilege," granted to a certain class of citizens, but not granted "upon the same terms" to another always results in an automatic violation of Article I, Section 21 guarantees. *Compare Bellemare v. Gateway Builders, Inc.,* 420 N.W.2d 733 (N.D. 1988) [classification that denied recovery to plaintiffs injured by improvements to real property more than ten years after completion but allowed recovery to plaintiffs injured within ten years after completion did not violate Article I, Section 21], *with Hanson v. Williams County, supra* [classification that denied recovery to plaintiffs injured by defective product more than ten years after purchase but allowed recovery to plaintiffs injured within ten years of purchase violated Article I, Section 21]. The constitutional protection against special privileges is not absolute because gov-

ernment "could not function without making classifications." *Benson v. N.D. Workmen's Comp. Bureau,* 283 N.W.2d 96, 103 (N.D.1979). *See also Hanson v. Williams County, supra,* 389 N.W.2d at 324 [state legislature is presumed to have acted within its constitutional power despite fact that laws result in some inequality]; *Nygaard v. Robinson,* 341 N.W.2d 349, 359 (N.D. 1983) [same]. The validity of a legislative classification, challenged under Article I, Section 21, depends largely on the choice of our standard of review:

"We apply strict scrutiny to an inherently suspect classification or infringement of a fundamental right and strike down the challenged statutory classification 'unless it is shown that the statute promotes a compelling governmental interest and that the distinctions drawn by the law are necessary to further its purpose.' *State ex rel. Olson v. Maxwell,* 259 N.W.2d 621, 627 (N.D.1977). When an 'important substantive right' is involved, we apply an intermediate standard of review which requires a ' "close correspondence between statutory classification and legislative goals." ' *Hanson v. Williams County,* 389 N.W.2d 319, 323, 325 (N.D.1986) [quoting *Arneson v. Olson,* 270 N.W.2d 125, 133 (N.D.1978)]. When no suspect class, fundamental right, or important substantive right is involved, we apply a rational basis standard and sustain the legislative classification unless it is patently arbitrary and bears no rational relationship to a legitimate governmental purpose. *See State v. Knoefler,* 279 N.W.2d 658, 662 (N.D. 1979)." *Gange v. Clerk of Burleigh County District Court,* 429 N.W.2d 429, 433 (N.D.1988).

█ Deciding the appropriate standard of review is straightforward in this case. It is beyond question in this jurisdiction that parents have a fundamental constitutional right to parent their children which is of the highest order. *See, e.g., In Interest of L.J.,* 436 N.W.2d 558, 561 (N.D.1989); *Kleingartner v. D.P.A.B.,* 310 N.W.2d 575, 578 (N.D.1981). We have specifically recognized that the right to enjoy " 'the do-

mestic relations and the privileges of the family and the home'" is embraced by the liberty and pursuit of happiness guarantees contained in Article I, Section 1 of the North Dakota Constitution. *State v. Cromwell*, 72 N.D. 565, 9 N.W.2d 914, 919 (1943) [quoting *Black's Constitutional Law*, section 145]. Thus, providing court-appointed counsel or not to a parent facing termination of parental rights affects a fundamental right and in the case of not providing counsel, impairs the exercise of that fundamental right. We, therefore, apply strict scrutiny to the classification because it impairs a fundamental right, and when we use strict scrutiny, we do not defer to the legislative choice of classification but, instead, subject the classification "to close analysis in order to preserve substantive values of equality...." Tribe, American Constitutional Law § 16–6, at p. 1451 (2d ed.1988). The relevant inquiry, therefore, becomes whether the failure to provide court-appointed counsel to indigent parents in proceedings under the Adoption Act, while providing indigent parents that very right in proceedings under the Juvenile Court Act and the Parentage Act, promotes a compelling state interest, and whether the distinction drawn by the classification is necessary to further that interest. *Gange, supra.* Only a compelling state interest justifies burdening the parent's fundamental right to enjoy a relationship with his or her child, and the state must bear the burden of demonstrating the necessity for doing so in this instance. *See generally, State ex rel. Olson v. Maxwell, supra*, 259 N.W.2d at 631–632; *In Interest of G.H.*, 218 N.W.2d 441, 447 (N.D.1974).

▮ Debra and Brad assert that the state has a compelling interest in conserving the fiscal resources that will be expended if indigent parents are afforded court-appointed counsel in stepparent adoption proceedings. However, we do not believe that an economic justification survives strict scrutiny analysis.

Although the state has a legitimate interest in its finances and there may be some fiscal impact in providing court-appointed counsel to an indigent parent in a steppar-

ent adoption proceeding, it is not a compelling one that overrides a person's fundamental interest in the parent-child relationship. As the United States Supreme Court in *Lassiter, supra*, 452 U.S. at 28, 101 S.Ct. at 2160, cautioned, a state's pecuniary interest "is hardly significant enough to overcome private interests as important as those here, ..." Moreover, there are guidelines for the recoupment of the costs of legal services from indigent parties who have received the benefit of court-appointed counsel, and procedures could be developed to accomplish recoupment. *See* North Dakota Supreme Court Administrative Rule 18(3)(a)(5)(d); Indigent Defense Procedures and Guidelines and Indigent Defense Contracts (1991–1993 Biennium), Guidelines for Defendant Reimbursement of Indigent Defense Costs, at p. 3.1 (November 1991). We conclude that the state's pecuniary interest here does not rise to the level of a compelling one. *See State ex rel. Olson v. Maxwell, supra.*

▮ Debra and Brad next assert that because a private individual, the stepparent, is seeking to terminate parental rights, rather than the state, there is no state action necessary to trigger the protection of Article I, Section 21. They argue that the Legislature has differentiated private-party adoptions from other termination proceedings and has decided to assist only those indigent individuals who must overcome the vast resources of the state. They say there is no equal protection violation because all people faced with termination of parental rights are treated the same, unless the state is an active participant in seeking the termination. Even assuming that there was such a conscious distinction made by the Legislature, and we find no evidence of that in the legislative history or in the record, we think this argument understates the actual involvement of the state in a stepparent adoption under the Adoption Act.

We agree with the response of the California Court of Appeal to a similar argument:

"A stepparent adoption differs from other parental termination cases in that it is

not an action brought by the state and argued by state attorneys. But neither is the adoption proceeding a purely private dispute. The state is called upon to exercise its exclusive authority to terminate the legal relationship of parent and child and establish a new relationship, in accordance with an extensive statutory scheme...." *In re Jay [R.]*, 150 Cal. App.3d 251, 197 Cal.Rptr. 672, 680 (1983).

Adoption, not recognized under the common law, is wholly a creature of statute. *Kottsick v. Carlson*, 241 N.W.2d 842 (N.D. 1976). Only a court may issue a final decree of adoption and then, only if it determines that statutory grounds for doing so have been satisfied. *See* NDCC § 14–15–19(3). Resort to the judicial process by the parties in this adoption proceeding was not voluntary; it was the only way the parties could accomplish their respective objectives. *See Matter of K.L.J.*, 813 P.2d 276, 283 (Alaska 1991).

The state's participation continues throughout the adoption process. Although the Department of Human Services is not required to make an investigation and file a report of the investigation in a stepparent adoption proceeding [*see* NDCC § 14–15–11(5) ], the Department or a county social service board is required to be named a party in the proceedings. *See* NDCC § 14–15–09(1)(i). As a named party, the Department had the right to participate in the district court proceeding and in this appeal, but chose not to do so. The clerk of court prepares an application for a birth record in the new name of the adopted individual and is required to forward the application to the appropriate vital statistics office. *See* NDCC § 14–15–18. The court is required to ensure the legislatively mandated confidentiality of the proceedings and records. *See* NDCC § 14–15–16. The clerk of court must also forward a copy of the adoption decree to the Department for statistical purposes. *See* NDCC § 14–15–18. Because termination of parental rights in an adoption proceeding is accomplished through a state mechanism, and state agencies remain involved throughout the proceedings, we believe that state involvement in a stepparent adoption is substantial even though the state may not always be an adversary.

That parental terminations need not be initiated by the state under the Adoption Act does not preclude the application of Article I, Section 21. The state is sufficiently involved in Adoption Act proceedings to actuate the constraints of the constitutional requirement that a privilege be granted only upon the same terms to similarly situated persons. We conclude that denying an indigent parent court-appointed counsel in a stepparent-adoption proceeding under the Adoption Act serves no compelling state interest and would deny that parent equality of the privilege of counsel which is granted, upon the same terms, to other indigent parents, and would therefore violate Article I, Section 21 of the North Dakota Constitution. *See also Zockert v. Fanning*, 310 Or. 514, 800 P.2d 773 (1990) [right to court-appointed counsel in adoption proceeding found under similar state equal protection provision]; *cf., Matter of K.L.J., supra* [right to court-appointed counsel in adoption proceeding found under state due process provision]; *In re Jay [R.], supra* [same].

Applying strict scrutiny to NDCC § 14–15–19(6) because it affects a fundamental interest, and reading it to exclude indigent parents in an adoption proceeding from the class of indigent parents entitled to counsel creates an impermissible, underinclusive classification, because the classification does not include all who are similarly situated. Our response to an underinclusive legislative classification under Article I, Section 21, has been to expand the classification to include those who had been denied the privilege, when the legislative intent to benefit the privileged class was clear. *See Hjelle v. Sornsin Construction Company*, 173 N.W.2d 431, 438 (N.D.1969); *cf., Christman v. Emineth*, 212 N.W.2d 543, 556 (N.D.1973) [proper classification for legislative purposes must embrace all who naturally belong to the class]; *Kroh v. N.D. Worker's Compensation Bureau*, 425 N.W.2d 899, 900 (N.D.1988) [" 'Where a statute is defective because of underinclusion there exist two remedial alternatives:

a court may either declare it a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion'" quoting *Welsh v. United States,* 398 U.S. 333, 361, 90 S.Ct. 1792, 1807–1808, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring)].

## IV

 If a statute is susceptible of two constructions, one of which would render it of doubtful constitutionality and one of which would not, the latter must be adopted. *See, e.g., Hanson v. Williams County, supra,* 389 N.W.2d at 324; *Patch v. Sebelius,* 320 N.W.2d 511, 513 (N.D. 1982); NDCC § 1–02–38(1) [presumption that in enacting a statute compliance with state constitution is intended]. NDCC § 14–15–19(6) allows the court, in its discretion, to appoint a "person" to represent any party in an adoption proceeding. But, it is unlawful for a non-attorney to represent any party before the courts of this state. *See* NDCC § 27–11–01; *compare* North Dakota Supreme Court Administrative Rule 34(4) [Certified Domestic Violence Advocate may "assist the petitioner in completing printed forms for proceedings" under NDCC Chapter 14–07.1, "sit with the petitioner during court proceedings," and "at the judge's discretion, make written or oral statements to the court"]. Harmonizing these statutes, as we must [*see, e.g., State v. Beilke,* 489 N.W.2d 589, 593 (N.D. 1992)], we construe the term "person" to mean an attorney. Furthermore, in order to avoid the constitutional infirmity in the statutory scheme authorizing termination of parental rights, we construe the discretionary authority of the trial court to be limited exclusively to the determination of whether a party opposing the adoption is, in fact, indigent and unable to afford counsel. If the trial court determines that the party is indigent, the court must appoint counsel to represent that person, unless the right is waived.

## V

 Debra and Brad do not dispute that Tom was indigent and unable to afford counsel during the adoption proceedings. Nor do they argue that Tom waived his right to court-appointed counsel. Rather, they urge that any error in failing to appoint counsel for Tom was harmless because the evidence adduced below established that Tom abandoned Karl.

We are skeptical that the denial of counsel to an indigent parent in an adoption proceeding which results in the termination of parental rights can ever be "harmless," under any standard. It is, after all, an axiom in criminal cases that counsel enables an accused to procure a fair trial [*see State v. Orr, supra,* 375 N.W.2d at 177–178], and the formality of these termination and adoption proceedings, along with their substantial threat to a fundamental interest of the parent, is not so different from those in a criminal case. But we need not decide the question here because the record before us is unequivocal that the trial court's failure to appoint counsel to represent Tom was not harmless error. At several points during the proceedings, Tom demonstrated his lack of knowledge of the law and his consequent need for assistance from an attorney.[3] The law of adoption and the procedure for terminating parental rights in a contested case are complex and

---

3. "Q [The Court] So why don't you just start out where you want to start and tell me how you feel about this.

"A [Tom] Well, first of all I would like to thank you, the Court, for allowing me to be here, you know, moving this hearing from Jamestown to Fargo. Because I wouldn't have been able, you know, to be there if it would have been held in Jamestown.

"I don't know what all the legal statutes and so on and so forth are all about. And I wish I could afford an attorney but I am not able to so I am just going to do the best I can.

 * * * * * *

"[Tom]: Can I ask you a question, Your Honor?

"THE COURT: Sure.

"[Tom]: What is this information here, this Revised Uniform Adoption Act and all this?

 * * * * * *

"[Tom]: So there are-how can I cite statutory codes or uniform adoption acts? Is there legal precedence that your decision is going to be based on?

demanding. *See, e.g., Matter of Adoption of P.R.D., supra; Pritchett v. Executive Dir. of Soc. Serv. Bd., supra.* We decline to infer from this record that counsel would not have assisted Tom in maintaining his parental rights and in demonstrating why his consent to the adoption of his child should be necessary. *See Matter of K.L.J., supra.*

Our disposition of this case renders it unnecessary to consider the other arguments raised by the parties. We reverse the judgment and remand for a new trial. We further grant Tom's request that the case be heard before a different district court judge who has not determined factual issues. If Tom requests the assistance of an attorney and establishes his indigency, the trial court must appoint counsel to represent him.

VANDE WALLE, C.J., concurs in the result.

MESCHKE, J., and RALPH J. ERICKSTAD, Surrogate Judge, concur.

Surrogate Judge RALPH J. ERICKSTAD was Chief Justice at the time this case was heard and served as surrogate judge for this case pursuant to NDCC 27–17–03.

Justice J. PHILIP JOHNSON, who was a member of the Court when this case was heard, did not participate in this decision.

Justice NEUMANN and Justice SANDSTROM, not being members of the Court when this case was heard, did not participate in this decision.

"THE COURT: Oh, I guess you could say that in a sense.

"[Tom]: I mean, are there any laws that I am protected under?

"THE COURT: Protected in the sense of how we protected you by giving you notice, by my insisting that Mr. Dalsted give notice of the hearing and by giving you an opportunity to be heard here. We have protected the interests that you have. Otherwise, when my decision is rendered I am not the final word. If you are not happy with it you have certain appeal rights which are guaranteed to you by statute. I will write my decision in the context of the law which generally revolves around the concept called the best interest of the child, although adoptions do not necessarily adhere entirely to that principal. Generally that's something that I am concerned about.

"There are, for example, statutes dealing with what constitutes abandonment, what constitutes failure to support, and what presumption the law attaches to time periods and those types of things. All of those are contained in the adoption act."