2009 ND 21

**In the Matter of the ADOPTION OF J.D.F., Minor Child.**

**D.D.F. and C.A.F., Petitioners and Appellees**

**v.**

**North Dakota Department of Human Services, Respondent**

**and**

**G.V.D., Respondent and Appellant.**

**No. 20080152.**

Supreme Court of North Dakota.

Feb. 5, 2009.

 

Daniel J. Nagle of Kelsch, Kelsch, Ruff & Kranda, Mandan, N.D., for petitioners and appellees.

Justin D. Hager of Richard B. Baer, P.C., Bismarck, N.D., for respondent and appellant.

MARING, Justice.

[¶ 1] G.V.D. ("Greg")[1] appeals from the district court's order terminating his parental rights to J.D.F. ("Jack") and granting the adoption of Jack to Jack's stepfather, D.D.F. ("Doug"). We conclude the district court erred by not informing Greg of his right to court-appointed counsel and by not deciding whether Greg qualified for court-appointed counsel. We reverse the district court's order terminating Greg's parental rights and remand for a new trial. If Greg establishes he is indigent and requests counsel, the district court must appoint counsel to represent him.

I

[¶ 2] Jack was born to "Cathy" and Greg on February 11, 1997. Cathy and Greg separated in May 2004, and their divorce was finalized later that year. Since May 2004, Cathy cared for and supported Jack. Cathy married Doug in June 2006. On December 4, 2007, Cathy and Doug petitioned for termination of Greg's parental rights and Doug's stepparent adoption of Jack based on Greg's "failure without justifiable cause to significantly communicate with the child for the past year plus and his failure to provide for the care and support of [Jack]."

[¶ 3] In a December 27, 2007, letter to the district court, Greg stated he had not been allowed to see Jack since Father's

1.   All names are pseudonyms.

Day, 2005. He alleged he had called Cathy "many times at her home, her job, and her parent[']s house," and he left messages, but never received a call back. Greg stated, "[t]he reason I have not brought [Cathy] into court regarding this matter is purely financial." Greg explained that he had a disorder that precluded him from working and "[b]ecause of this[,] I have no money for an attorney and am not eligible for legal assistance regarding this case."

[¶ 4] Greg's mother and his sister sent the court letters, stating Greg was a good father, they wished to see Jack, and they had tried to maintain contact with him. Greg's other son, Jack's half-brother, also wrote the court, stating he hoped to see Jack again soon and informed the court he had maintained contact with Jack until Cathy changed her phone number.

[¶ 5] The district court held a hearing on December 31, 2007. The court asked Greg what his position was on the termination of his parental rights. Greg told the court he was against it, he loved his son, and he had tried to contact Jack "many, many, many times" over the past two and one half years. Greg also told the court he had left messages, sent Jack cards, and sent birthday money. The district court said it was not going to rule on the matter but was going to give Greg "an opportunity to obtain counsel or respond to the petition." Greg inquired if he could see Jack. The court informed Greg, "you may want to consult with an attorney to see what your rights might be," and "you have rights under the divorce decree. If you wish to contact an attorney and investigate those rights. . . ." The court adjourned the hearing.

[¶ 6] Greg sent a letter to the court on January 21, 2008, stating, "I would like to make a request for a continuous [sic] to give me a little more time to prepare for this case. I am in the process of getting an attorney and a little extra time would really be appreciated." The district court granted the continuance.

[¶ 7] The court held an evidentiary hearing on April 21, 2008. A different judge presided than at the December 2007 hearing. Cathy testified that Greg initially exercised visitation intermittently in the first year following the divorce and that at the end of each visit, Greg failed to meet her in Fargo, North Dakota, to return Jack. Cathy also testified that she had to provide gas money to Greg for the visits. Cathy testified that when Jack returned from the third visit with his father, he was "very distraught, he was suicidal" and she had to take him to a counselor. Cathy testified that the counselor informed her that Jack should not have any further contact with Greg unless supervised. Cathy also stated that Greg had not had any visitation with Jack since June 2005. Cathy testified that, after the June 2005 visit, Greg told Cathy and Doug over the telephone that he would kill them. Cathy stated she had to secure a restraining order against Greg. Cathy testified that Greg had provided no financial support to Jack since the divorce. Cathy stated Doug sent one birthday card, one letter, and his family members sent a birthday card.

[¶ 8] During the hearing, Greg attempted to cross-examine Cathy:

> The Court: Do you have any questions of the witness?
>
> [Greg]: Well, I guess the question I have, your Honor, is the reason I wasn't able to see [Jack], visit him—
>
> The Court: No, no. You're not making statements at this time. This isn't when you would testify or provide evidence. So, if you have questions, ask the questions, please.

[Greg]: Okay. Off the top, not right now. No, I don't, your Honor.

[¶ 9] Doug then testified that he had done nothing to frustrate Greg's visitation, Greg had not provided any financial support to Jack, and Greg had not exercised visitation with Jack since he and Cathy were married. The Court asked Greg if he had any questions for Doug. Greg responded, "I do not at this time, your Honor."

[¶ 10] The court then asked Greg if he wished to present any evidence. Greg called his older son. The older son testified that he believed Cathy and Doug's testimony was inaccurate. The older son stated Jack had visited them five times, not three. Greg then asked the older son:

[A]s far as me not seeing [Jack], from what you witnessed, has it been a lack of effort on my part to get a hold of [Jack], not want to see him, or was it more like I was being denied by making phone calls and sending letters and trying to get a hold of him to see [Jack]? Did you see it as like me neglecting, not making an effort to do that or like I was unable to because they were not returning my phone calls or allowing me to see [Jack]?

Cathy and Doug objected to the line of questioning as speculative. The court sustained the objection. Greg did not ask additional questions. Cathy and Doug did not ask any questions. The court asked a few questions of the older son.

[¶ 11] Greg then testified that he had tried to maintain a relationship with Jack, but Cathy and Doug denied his visits and attempts to communicate with Jack. Greg stated, "I'm willing to go into any kind of a mediation to visit with [Jack] and to do whatever I possibly can within my power to make a relationship with my son because I love my son a lot. . . ." Greg testified he was currently in the process of applying for disability and "that's what is

making [him] have a really hard time financially." On cross-examination, Greg stated that when he talked to Jack, he learned Jack had not received his messages or the birthday card. Greg also testified he did not send money because he did not have money to send and was not sure Jack would receive the money if he did send it. Greg stated he has applied for disability twice, has been denied both times, and, at the time of the hearing, was appealing that denial.

[¶ 12] The court then asked Greg if he had "ever tried to get a court order for visitation?" Greg replied,

[L]ike I said, being in the financial situation I've been in, haven't been able to do that financially because no money right now. But as far as—actually I could not afford to get an attorney to do this, so I couldn't pursue that on my own. I needed to have an attorney to help me out, and I could not get one. So I couldn't.

Greg indicated he had a great relationship with Jack, loved him, had not been permitted to see Jack since June 2005, and would do whatever it took to see Jack again.

[¶ 13] The district court terminated Greg's parental rights and granted the petition for adoption. The court stated:

I believe that you love [Jack], but I don't believe you've been a father to him. I don't believe that you've provided care, control, support, and I don't think there's any legitimate or good reason why that hasn't occurred.

I suppose that in the long run, it's going to be best for [Jack] to know you love him and care for him, and I suppose that as he grows up, he may want to have some contact, and I hope that will be able to happen. But in terms of being in the role of a father, you just

haven't been, and he needs to have someone in that role.

[¶ 14] The district court did not inform Greg at either of the hearings that he had a right to be represented by counsel and that if he was indigent, he had a right to court-appointed counsel.

[¶ 15] Greg appeals, arguing: (1) the district court erred in violating his right to court-appointed counsel; and (2) the district court erred in granting an involuntary termination of his parental rights and granting an adoption. Because we conclude the district court erred in not informing Greg of his right to court-appointed counsel, we need not address the second issue.

II

Right to Counsel

[¶ 16] We are presented with the issue of whether the district court violated Greg's right to court-appointed counsel in an involuntary termination of parental rights action under N.D.C.C. ch. 14–15, the Revised Uniform Adoption Act. Our first inquiry is whether Greg was entitled to be informed of such a right by the district court. Involuntary termination of parental rights may be accomplished under three separate provisions of North Dakota law: (1) the Uniform Juvenile Court Act; (2) the Uniform Parentage Act; and (3) the Revised Uniform Adoption Act. *Adoption of K.A.S.*, 499 N.W.2d 558, 560 (N.D.1993). At the time of *K.A.S.*, both the Juvenile Court Act and the Parentage Act clearly gave an indigent parent the right to legal counsel, but it was less clear whether such a right existed under the Adoption Act. *Id.* at 561.

[¶ 17] In *K.A.S.*, we concluded that interpreting the Adoption Act to deny court-appointed assistance to an indigent parent "would run afoul of the equal protection provision of our state constitution." *Id.* at 563. We held that "allowing an indigent parent an opportunity to receive assistance of appointed counsel to protect parental rights is a 'privilege' within the meaning of Article I, Section 21." *Id.* We explained that this privilege was not granted

"upon the same terms" to indigent parents who face Adoption Act proceedings to terminate their parental rights. It makes no difference to parents whether their parental rights are challenged in a proceeding under the Juvenile Court Act, the Parentage Act, or the Adoption Act. Each challenge threatens presently existing parental rights; each seeks the termination of the parent-child relationship. The ultimate termination of parental rights under any of the acts has been described as "punishment more severe than many criminal sanctions."

*Id.* (citations omitted). Thus, we concluded, "that denying an indigent parent court-appointed counsel in a stepparent-adoption proceeding under the Adoption Act serves no compelling state interest and would deny that parent equality of the privilege of counsel which is granted, upon the same terms, to other indigent parents, and would therefore violate Article I, Section 21 of the North Dakota Constitution." *Id.* at 566.

[¶ 18] Since *K.A.S.*, we have consistently held that an indigent parent has a right to court-appointed assistance in a termination of parental rights action. *See Interest of I.B.A.*, 2008 ND 89, ¶ 8, 748 N.W.2d 688; *Adoption of S.A.L.*, 2002 ND 178, ¶ 15, 652 N.W.2d 912; *Adoption of J.M.H.*, 1997 ND 99, ¶ 21, 564 N.W.2d 623; *Adoption of J.S.P.L.*, 532 N.W.2d 653, 660 (N.D.1995). While a district court must appoint counsel if it finds the parent is financially unable to obtain legal assistance, we have not previously addressed a district court's responsibility to inform in-

digent parents of the right to court-appointed counsel. We hold that a district court must advise parents that they are entitled to representation by counsel, provided by the State if necessary, throughout any proceedings to terminate the parent-child relationship against their will. *See Peters–Riemers v. Riemers,* 2004 ND 28, ¶ 8, 674 N.W.2d 287 (holding a district court must inform an individual of his right to court-appointed counsel in a contempt proceeding when incarceration is a possible punishment); *State v. Grenz,* 243 N.W.2d 375, 379 (N.D.1976) (holding a district court must inquire of a juvenile whether he knew and understood his right to counsel); *Walker v. Walker,* 892 A.2d 1053, 1055 (Del.2006) ("[T]he trial court must advise parents of their right to seek court-appointed counsel and must determine whether to appoint counsel, if requested, in *all* termination proceedings."); *Brown v. Division of Family Services,* 803 A.2d 948, 958 (Del.2002) (holding family courts must provide parents facing termination proceedings with a timely notice of their right to court-appointed counsel, if found indigent); *In re Adoption of G.W.B.,* 776 N.E.2d 952, 954 (Ind.Ct.App.2002) (holding parents whose parental rights are being terminated against their will have the right to be informed of the right to counsel); *Matter of Chad S.,* 580 P.2d 983, 986 (Okl.1978) ("[I]mplicit in the right to counsel is the right to notice that counsel will be provided without expense to the indigent parents."); *Matter of B.,* 30 N.Y.2d 352, 334 N.Y.S.2d 133, 285 N.E.2d 288, 290 (1972) (holding that an individual who has a right to court-appointed counsel in a child neglect case must be advised of that right). In this case, the district court erred by not affirmatively advising Greg of his right to counsel and that if he was indigent, his right to court-appointed counsel.

## III

### Waiver of Right to Counsel

[¶ 19] While an indigent parent has a right to court-appointed counsel, this right is not absolute and can be waived. *Adoption of S.A.L.,* 2002 ND 178, ¶ 15, 652 N.W.2d 912. We have stated that "waiver of counsel in criminal cases provides guidance in evaluating the validity of a waiver in a parental rights termination proceeding." *Interest of I.B.A.,* 2008 ND 89, ¶ 9, 748 N.W.2d 688. Parental rights cases are comparable to criminal cases because "the serious threat to a fundamental interest of a parent is not so different from the serious threat to the physical liberty of a criminal defendant." *Id.*

[¶ 20] In *I.B.A.,* we explained that in criminal cases:

Defendants who represent themselves must voluntarily, knowingly, and intelligently relinquish the benefits of counsel. Whether a defendant's waiver of the right to counsel was knowing and intelligent depends on the facts and circumstances of each case. To intelligently and knowingly choose self-representation, a defendant should be aware of the dangers and disadvantages of proceeding without the skill and experience of counsel. The record must establish that the choice was made "with eyes open." *Id.*

[¶ 21] On this record, we cannot conclude Greg voluntarily, knowingly, and intelligently relinquished the right to counsel. The district court never provided Greg with an application for court-appointed counsel, nor did it ever verbally inform Greg of his right to counsel. Additionally, none of the notices sent by the district court indicated that an indigent parent has a right to court-appointed counsel. Although Greg made a number of statements indicating his desire for an attorney and his inability to procure legal assistance, the district court never informed him that he

had a right to appointed counsel if he was indigent. Here, the district court merely suggested Greg might want to consult an attorney concerning his visitation rights under the divorce decree. Thus, we cannot conclude that Greg waived his right to counsel "with eyes open" when the record clearly indicates that he did not know he had such a right.

[¶ 22] Doug, the stepfather, argues that if the district court erred, it was harmless error. We have previously expressed that "[w]e are skeptical that the denial of counsel to an indigent parent in an adoption proceeding which results in the termination of parental rights can ever be 'harmless,' under any standard." *K.A.S.*, 499 N.W.2d at 567. "The law of adoption and the procedure for terminating parental rights in a contested case are complex and demanding." *Id.* at 567–68. A parent in a termination proceeding must "execute basic advocacy functions to delineate the issues, investigate and conduct discovery, present factual contentions in an orderly manner, cross examine witnesses, make objections, and preserve a record for appeal." Rosalie R. Young, "The Right to Appointed Counsel in Termination of Parental Rights Proceedings: The States' Response to *Lassiter,* 14 Touro L.Rev. 247, 257–58 (1997) (citation omitted)." "Without competent counsel, parents in [termination of parental rights] proceedings will be unlikely to mount an effective defense." Nadine Vasser, "The Indigent Parent's Right to Counsel in Termination of Parental Rights Proceedings," 16 J. Contemp. Legal Issues 329, 330 (2007). The record reveals that Greg was unable to mount an effective defense in the termination of parental rights hearing. Greg did not know how to present important evidence, cross-examine witnesses, or respond to objections. Greg also faced a complex legal argument pertaining to whether he had a justifiable cause that precluded him from caring, supporting, or communicating with Jack. Based on this record, Greg was unable to effectively articulate such a cause without any legal assistance. The district court's failure to inform Greg of his right to court-appointed counsel affected his substantial rights and therefore was not harmless error under N.D.R.Civ.P. 61.

## IV

[¶ 23] Therefore, we reverse the district court's order terminating Greg's parental rights and granting the adoption of Jack, and we remand for a new trial. On remand, the district court must inform Greg of the right to counsel. If Greg establishes he is indigent and requests counsel, the district court must appoint counsel to represent him.

[¶ 24] GERALD W. VANDE WALLE, C.J., JOHN C. McCLINTOCK, JR., D.J., DANIEL J. CROTHERS, and CAROL RONNING KAPSNER, JJ., concur.

[¶ 25] The Honorable John McCLINTOCK, JR., D.J., sitting in place of SANDSTROM, J., disqualified.