735 N.E.2d 1071 (2000)
316 Ill. App.3d 110
249 Ill.Dec. 246
In re ADOPTION OF K.L.P., a Minor (R.R.E. and T.M.D., Petitioners-Appellees,
v.
R.P., Respondent-Appellant). In re Adoption of K.M.P., a Minor (R.R.E. and T.M.D., Petitioners-Appellees,
v.
R.P., Respondent-Appellant).
Nos. 2-99-1260, 2-99-1261.
Appellate Court of Illinois, Second District.
September 8, 2000.
*1073 Anna M. Wilhelmi, Anna M. Wilhelmi Law Offices, P.C., Aurora, for appellant.
Timothy J. McCann, State's Attorney, Yorkville (Gregory L. Slovacek, State's Attorneys Appellate Prosecutor's Office, of counsel), Charles R. Rea, Plano, for appellees.
Justice THOMAS delivered the opinion of the court:
On April 6, 1999, the petitioners, R.R.E. and T.M.D., filed petitions in the circuit court of Kendall County to adopt K.L.P., who was born on October 31, 1989, and K.M.P., who was born on March 19, 1991. R.R.E. is the biological father of the children, and T.M.D. is R.R.E.'s wife. In their petitions, they alleged that the respondent, R.P., who is the biological mother of the children, was an unfit parent under sections 1(D)(b), (D)(d), (D)(e), (D)(f), (D)(g) and (D)(m) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(d), (D)(e), (D)(f), (D)(g), (D)(m) (West 1998)), and they requested that the trial court terminate the respondent's parental rights. *1074 Prior to trial, the respondent informed the court that she could not afford to hire an attorney and requested that the court appoint the public defender to represent her. The trial court denied the request and set the cause for a hearing on the petitions. Following separate hearings on parental unfitness and the best interests of the children, the trial court found the respondent to be an unfit parent and terminated her parental rights. The respondent appeals, contending that her rights to due process and equal protection under the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV) were violated when she was not afforded the right to counsel during the proceedings to terminate her parental rights.
A court reporter was not present for any of the proceedings in this adoption case, and therefore the record does not contain any report of proceedings. However, the record does contain a certified bystander's report of the proceedings pursuant to Supreme Court Rule 323(c) (166 Ill.2d R. 323(c)). That bystander's report reveals that on June 22, 1999, the respondent appeared pro se before the trial court and informed the court that she could not afford to hire an attorney and requested time to hire counsel, which the trial court allowed. On July 20, 1999, the respondent again told the court that she could not afford to hire an attorney. She stated that she went to several attorneys, including Prairie State Legal Services. She noted that she could not afford to hire any of the attorneys she spoke with and that Prairie State Legal Services had sent her a letter rejecting her as a client. The respondent then asked the court to appoint the public defender to represent her. The trial court refused her request for appointment of counsel and set the case for a trial on the issue of parental unfitness.
The record further reveals that on April 20, 1995, several years prior to the petitions for adoption, the Department of Children and Family Services (the DCFS) took protective custody of K.M.P and then filed petitions for adjudication of wardship, alleging that she was an abused and neglected minor (case Nos. 95-J-29 and 95-J-121). On February 5, 1996, the DCFS took protective custody of K.L.P. and filed a petition for adjudication of wardship alleging that she was a neglected minor (case No. 96-J-4). Prior to the hearings on those petitions, which were brought pursuant to section 2-3 of the Juvenile Court Act of 1987 (the Juvenile Court Act) (705 ILCS 405/2-3 (West 1998)), the respondent was notified of her right to court-appointed counsel at all stages of the proceeding in the event that she was financially unable to employ counsel (see 705 ILCS 405/1-5(1) (West 1998)). The trial court appointed the public defender to represent the respondent in the proceedings under the Juvenile Court Act. The trial court subsequently entered orders adjudicating K.M.P. an abused and neglected minor and adjudicating K.L.P. a neglected minor. The State was granted leave to file a petition to terminate parental rights. However, no such petition was ever filed by the State. The court placed custody of the children with the petitioner father. The trial court thereafter dismissed the cases pending under the Juvenile Court Act.
On April 6, 1999, the petitioners filed their petitions for adoption, alleging that the respondent was an unfit mother and requesting that her parental rights be terminated. On September 28, 1999, the hearing began on the unfitness portion of the case. At that hearing, the petitioners presented the testimony of various social workers, counselors, and DCFS investigators and caseworkers, showing that the respondent had abused the children and had failed to make reasonable progress toward the DCFS client service plan goals and the return home of the children.
After the petitioners rested their case, the mother presented her case but did not call any witnesses. She did testify on her own behalf at the unfitness hearing that she had had a rough start as a mother and *1075 had made "mistakes." On cross-examination, she acknowledged that the "mistakes" she had referred to in her testimony were those testified to by the petitioners' witnesses. She also admitted that a third child of hers had been removed from her care by DCFS and had been placed with the respondent's mother.
At the conclusion of the hearing, the trial court found that the respondent was an unfit parent. The cause then proceeded to a best-interest hearing to determine whether the respondent's parental rights should be terminated. Gertrude Kleckner, a licensed clinical social worker, gave testimony on behalf of the petitioners consistent with a letter that she wrote to the court on September 30, 1999. In that letter, Kleckner stated that she had worked with the petitioners and the children for the past year. She noted that the children expressed sadness, anger, fear, hatred, and anxiety when discussing the respondent. She further noted that they did not have a bond with the respondent and did not wish to see or talk to her again. She also noted that the petitioners provided an excellent healing environment for the children and that the children had made much progress since coming to live with the petitioners. She stated, however, that this progress was fragile and could be jeopardized by any forced contact with the respondent. She concluded that it would be in the children's best interest to be adopted by the petitioners.
The petitioners both testified about the significant progress that the children had made since they came to live with the petitioners. Their testimony indicated that, when the children first came to live with them, the children exhibited signs of anxiety, including nightmares, baby talk, and self-injury. They noted the children's regression when the possibility of having to go to court and face the respondent was mentioned. Petitioner T.M.D. described her close relationship with the children and her love for them.
The respondent did not call any witnesses to testify on her behalf at the best interest hearing. Moreover, the respondent herself did not testify at the best-interest hearing.
After hearing all of the evidence, the trial court stated that "the facts were severe enough" to terminate the respondent's parental rights and that termination was "necessary and just." In its written order, the court found that the allegations of the petitions concerning "physical cruelty" and "lack of interest" were proved and that it was in the best interests of the children that the prayers of the petitioners for adoption be granted.
On appeal, the respondent argues that she was denied due process and equal protection under the fourteenth amendment to the United States Constitution when she was not afforded counsel during the proceedings to involuntarily terminate her parental rights. She maintains that due process principles as set forth in Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), required the trial court to appoint her counsel under the facts of the present case. She also contends that her right to equal protection was violated because she was not statutorily entitled to court-appointed counsel in this proceeding filed under the Adoption Act (750 ILCS 50/0.01 et seq. (West 1998)), while the appointment of counsel is statutorily mandated for similarly situated respondents who are facing the termination of parental rights pursuant to the Juvenile Court Act (705 ILCS 405/1-5(1) (West 1998)). We will first address the respondent's due process claim.
In Lassiter, the United States Supreme Court considered whether the due process clause of the fourteenth amendment routinely requires the appointment of counsel for indigent parents in every parental-rights termination proceeding. Lassiter, 452 U.S. at 31, 101 S.Ct. at 2161-62, 68 L.Ed.2d at 652. The Court noted that an indigent litigant has an automatic right to appointed counsel only when he may be *1076 deprived of his physical liberty because it is the defendant's interest in personal freedom that triggers the right to appointed counsel. Lassiter, 452 U.S. at 25, 101 S.Ct. at 2158, 68 L.Ed.2d at 648. However, the Court continued its analysis, recognizing that "a parent's desire for and right to `the companionship, care, custody, and management of his or her children' is an important interest that `undeniably warrants deference and, absent a powerful countervailing interest, protection.' [Citation.]" Lassiter, 452 U.S. at 27, 101 S.Ct. at 2159-60, 68 L.Ed.2d at 649-50. The Court analyzed and weighed the three factors from Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), namely, the private interest at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions, against the presumption that there is no right to appointed counsel when there is no risk of lost liberty. Lassiter, 452 U.S. at 27, 101 S.Ct. at 2159, 68 L.Ed.2d at 649.
The Lassiter Court concluded that a weighing of the Eldridge factors would not always rebut the presumption that the appointment of counsel for indigent parents facing the termination of parental rights was not constitutionally required. The court explained:
"If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the Eldridge factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel. But since the Eldridge factors will not always be so distributed, and since `due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed,' [citation], neither can we say that the Constitution requires the appointment of counsel in every parental termination proceeding." Lassiter, 452 U.S. at 31-32, 101 S.Ct. at 2162, 68 L.Ed.2d at 652. Thus, the Court held that the appointment of counsel was not automatically required to assure a fair adjudication; instead, a case-by-case determination of the need for counsel would suffice, an assessment to be made in the first instance by the trial court, subject to appellate review. Lassiter, 452 U.S. at 32, 101 S.Ct. at 2162, 68 L.Ed.2d at 652.
The petitioners in the present case argue that the due process analysis of Lassiter is inapplicable to the present case because the state did not initiate the termination proceeding. Relying on Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), they contend that because private individuals, a stepparent and natural father, initiated the proceedings, there is no state action necessary to trigger the due process clause.
The petitioners' reliance on Blum is misplaced. In that case, medicaid patients challenged decisions by nursing homes in which they resided to discharge patients without notice or an opportunity for a hearing. Blum, 457 U.S. at 993, 102 S.Ct. at 2780, 73 L.Ed.2d at 539-40. The Court specifically emphasized that particular state regulations or procedures were not challenged and the lawsuit sought to hold state officials liable for the actions of private parties. Blum, 457 U.S. at 1003, 102 S.Ct. at 2785, 73 L.Ed.2d at 545-46. The Supreme Court in Blum relied on its prior precedent in Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), for the notion that the mere fact that a business is subject to state regulation does not by itself convert its action into that of the state for purposes of the fourteenth amendment. Blum, 457 U.S. at 1004, 102 S.Ct. at 2786, 73 L.Ed.2d at 546. In such cases, the complaining party must show that there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may fairly be treated as that of the state. *1077 Blum, 457 U.S. at 1004, 102 S.Ct. at 2786, 73 L.Ed.2d at 546.
We find Blum and Jackson to be inapplicable here. Unlike in Blum and Jackson, the instant respondent's parental rights could be terminated only pursuant to a comprehensive statutory scheme. Here, the respondent is challenging the lack of a provision in the Adoption Act for the appointment of counsel for indigent respondents. Thus, a specific procedure of the state is being challenged. This case is more closely analogous to the Supreme Court's decisions in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), where the Supreme Court held that a Washington statute involving grandparent visitation violated substantive due process as applied, and M.L.B. v. S.L.J., 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996), where the Court held that a state procedure requiring an indigent mother to pay a fee to appeal the termination of her parental rights violated due process and equal protection. In those cases, it was not important that there was not a state-initiated action filed, in that the grandparents filed the petition for visitation in Troxel (Troxel, 530 U.S. at ___, 120 S.Ct. at 2057, 147 L.Ed.2d at ___), and the father and his new wife filed the petition for adoption in M.L.B. (M.L.B., 519 U.S. at 107, 117 S.Ct. at 559, 136 L.Ed.2d at 482). Instead, the important fact was that specific procedures or regulations of the state were at issue.
Although it was not cited by the parties in the instant case, we are obliged to discuss the decision of the Appellate Court, First District, in Rosewell v. Hanrahan, 168 Ill.App.3d 329, 119 Ill.Dec. 542, 523 N.E.2d 10 (1988). There, the First District court concluded that, because of a lack of "state action," the due process principles as set forth in Lassiter did not apply in an adoption proceeding filed by the maternal grandparents that requested the termination of parental rights. Rosewell, 168 Ill.App.3d at 333, 119 Ill.Dec. 542, 523 N.E.2d 10. However, Rosewell simply relied on Blum and Jackson. As we have previously discussed, Rosewell and Jackson must be distinguished from the present case. Because we believe that Rosewell was wrongly decided, we decline to follow it.
Even though Lassiter involved a state-initiated parental rights proceeding, whereas the present case involves a proceeding under the Adoption Act, we note that courts have applied the rationale of Lassiter when considering the question of whether the appointment of counsel for an indigent parent was necessary when the involuntary termination of parental rights was at stake through private adoption proceedings that were not initiated by the State. See, e.g., In re Adoption of Dale A., 453 Pa.Super. 106, 683 A.2d 297 (1996); In re Adoption of K.A.S., 499 N.W.2d 558 (N.D.1993). In K.A.S., the North Dakota Supreme Court determined that the state's involvement in a stepparent adoption was substantial enough to trigger constitutional protections because the termination of parental rights is accomplished through a state mechanism with the involvement of state agencies even though the state may not always be an adversary. K.A.S., 499 N.W.2d at 566. In reaching its conclusion, the K.A.S. court quoted the response of the California Court of Appeal to a similar argument:
"`A stepparent adoption differs from other parental termination cases in that it is not an action brought by the state and argued by state attorneys. But neither is the adoption proceeding a purely private dispute. The state is called upon to exercise its exclusive authority to terminate the legal relationship of parent and child and establish a new relationship, in accordance with an extensive statutory scheme.'" K.A.S., 499 N.W.2d at 565-66, quoting In re Jay R., 150 Cal.App.3d 251, 262, 197 Cal.Rptr. 672, 680 (1983).
We agree with the above-noted rationale. Because the common law did not provide for the concept of the adoption *1078 of children, adoption rights and duties are determined by statute. In re M.M., 156 Ill.2d 53, 63, 189 Ill.Dec. 1, 619 N.E.2d 702 (1993); In re Estate of Edwards, 106 Ill. App.3d 635, 636, 62 Ill.Dec. 407, 435 N.E.2d 1379 (1982). Under the Illinois statutory scheme, an adoption results in a complete and permanent severance of the parental rights between a biological parent and child. In re M.M., 156 Ill.2d at 62, 189 Ill.Dec. 1, 619 N.E.2d 702. Furthermore, a proceeding to involuntarily terminate parental rights is a drastic measure (In re D.R., 307 Ill.App.3d 478, 482, 241 Ill.Dec. 93, 718 N.E.2d 664 (1999)) that may only be brought under the statutory authority of the Juvenile Court Act of 1987 (705 ILCS 405/1-1 et seq. (West 1998)) or the Adoption Act (750 ILCS 50/0.01 et seq. (West 1998)) (see In re M.M., 156 Ill.2d at 61, 189 Ill.Dec. 1, 619 N.E.2d 702). Regardless of under which act the termination action is brought, the goals of the proceedings are identical-(1) to determine whether the natural parent is unfit and, if so, (2) to determine whether the adoption will best serve the child's needs. In re M.M., 156 Ill.2d at 61, 189 Ill.Dec. 1, 619 N.E.2d 702. Yet, under the Juvenile Court Act an indigent respondent is entitled to court-appointed counsel, whereas no similar provision exists under the Adoption Act. In that regard, section 1-5(1) of the Juvenile Court Act affords indigent parents certain rights, including the right to counsel as follows:
"[P]arties respondent have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also, although proceedings under this Act are not intended to be adversary in character, the right to be represented by counsel. At the request of any party financially unable to employ counsel * * * the court shall appoint the Public Defender or such other counsel as the case may require. Counsel appointed for * * * any indigent party shall appear at all stages of the trial court proceeding, and such appointment shall continue through the permanency hearings and termination of parental rights proceedings * * *." 705 ILCS 405/1-5(1) (West 1998).
The Adoption Act, however, does not provide similarly for the appointment of counsel in all cases where indigent parents are facing the involuntary termination of parental rights. Instead, section 13(B)(c) of the Adoption Act provides for the appointment of counsel only when an indigent parent is alleged to be an unfit person pursuant to section 1(D)(p) of the Act, which involves a parent's "[inability to discharge parental responsibilities" because of "mental impairment, mental illness or mental retardation." 750 ILCS 50/13(B)(c), 1(D)(p) (West 1998).
Given the nature of adoption and the fact that resort to the statutory scheme and the judicial process is necessary for its accomplishment, we find that the required state action is present here. The state is responsible for the specific conduct of which the respondent complains. The state action in this case is significant in that it provides the statutory scheme. Moreover, the state was involved in the initial proceedings in this case pertaining to the adjudications of wardship and much of the evidence presented at the adoption proceedings was garnered as a result of the state's investigations. At one point, the State's Attorney even asked leave of court to file a termination petition under the Juvenile Court Act. However, no such petition was ever filed, and the proceedings under the Juvenile Court Act were dismissed when guardianship was granted to R.R.E. Under these circumstances, the specter could be raised that the state intentionally chose to forego prosecution of a termination of parental rights petition, knowing that the accomplishment of its goal could be reached with greater ease and less expense without its involvement in a proceeding to terminate parental rights if the respondent could be denied the benefit of court-appointed counsel. It is the *1079 state's procedure of not providing counsel in the present case that is at issue. Under the circumstances, we find that the requisite state action is present in this case to trigger an analysis on due process grounds.
We now turn to the question of whether the respondent was denied due process under the facts of this case. With respect to the particular facts in Lassiter, the Supreme Court concluded that the trial court did not deny the indigent mother involved in that case due process when it did not appoint counsel for her. Lassiter, 452 U.S. at 33, 101 S.Ct. at 2163, 68 L.Ed.2d at 653. In so finding, the Court found it significant that the petition to terminate parental rights contained no allegations of neglect or abuse upon which criminal charges could be based; no expert witnesses testified; the case did not present any specially troublesome points of law, either procedural or substantive; and, despite the admission of hearsay evidence, the weight of the evidence was sufficiently great that the presence of counsel on the mother's behalf could not have made a determinate difference. Lassiter, 452 U.S. at 32-33, 101 S.Ct. at 2162, 68 L.Ed.2d at 653. The Court also found it significant that the mother demonstrated her indifference by failing to appear at a custody hearing. Lassiter, 452 U.S. at 32-33, 101 S.Ct. at 2162-63, 68 L.Ed.2d at 653. We find the facts of the present case to be similar to those in Lassiter. Here, there was no claim that criminal charges could be brought based on the allegations of neglect and abuse, no expert witnesses testified, and the case did not present any troublesome points of law. Furthermore, the evidence in this case was not closely balanced and we are unable to say that the presence of counsel would have made a determinative difference. Accordingly, we find that the trial court did not err in failing to appoint counsel for the respondent on procedural due process grounds.
We next consider whether allowing the involuntary termination of the parental rights of an indigent parent without the appointment of counsel through an adoption proceeding would violate the equal protection clause. The respondent points out that the Juvenile Court Act provides for the appointment of counsel for indigent parents facing the involuntary termination of parental rights pursuant to that act (see 705 ILCS 405/1-5(1) (West 1998)), while the Adoption Act contains no similar provision for parents facing involuntary termination. The respondent argues that the Juvenile Court Act and the Adoption Act must be read in concert with one another to allow for the appointment of counsel in both cases; otherwise, the denial of counsel to her would violate her equal protection rights as applied.
The same analysis is used in assessing equal protection claims under both the United States and Illinois Constitutions. Jacobson v. Department of Public Aid, 171 Ill.2d 314, 322, 216 Ill.Dec. 96, 664 N.E.2d 1024 (1996). The guarantee of equal protection requires that government deal with "similarly situated" individuals in a similar manner. Jacobson, 171 Ill.2d at 322, 216 Ill.Dec. 96, 664 N.E.2d 1024. It does not preclude the state from enacting legislation that draws distinctions between different categories of people, but it does prohibit the government from according different treatment to persons who have been placed by statute into different classes on the basis of criteria wholly unrelated to the purpose of the legislation. People v. Shephard, 152 Ill.2d 489, 499, 178 Ill.Dec. 724, 605 N.E.2d 518 (1992). In reviewing a claim that a statute violates equal protection, the court applies different levels of scrutiny depending on the nature of the statutory classification involved. Committee for Educational Rights v. Edgar, 174 Ill.2d 1, 33, 220 Ill. Dec. 166, 672 N.E.2d 1178 (1996). Classifications based on race or national origin or affecting fundamental rights are strictly scrutinized. Jacobson, 171 Ill.2d at 323, 216 Ill.Dec. 96, 664 N.E.2d 1024. Intermediate scrutiny applies to discriminatory *1080 classifications based on sex or illegitimacy. Jacobson, 171 Ill.2d at 323, 216 Ill.Dec. 96, 664 N.E.2d 1024. In all other cases, the court employs a rational basis review. Jacobson, 171 Ill.2d at 323, 216 Ill.Dec. 96, 664 N.E.2d 1024.
The applicable standard of review in this case depends upon whether the complained-of disparate treatment interferes with or impinges upon a fundamental right. Committee for Educational Rights, 174 Ill.2d at 33, 220 Ill.Dec. 166, 672 N.E.2d 1178. A fundamental right for equal protection purposes is one that lies at the heart of the relationship between the individual and a republican form of nationally integrated government. Committee for Educational Rights, 174 Ill.2d at 33, 220 Ill.Dec. 166, 672 N.E.2d 1178. It is beyond dispute that a parent's interest in maintaining a parental relationship with her child is a fundamental liberty interest protected by the fourteenth amendment. Troxel, 530 U.S. at ___, 120 S.Ct. at 2060, 147 L.Ed.2d at ___; M.L.B., 519 U.S. at 118-19, 124, 117 S.Ct. at 565, 568, 136 L.Ed.2d at 489, 493; Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606 (1982); In re D.R., 307 Ill.App.3d 478, 482, 241 Ill.Dec. 93, 718 N.E.2d 664 (1999). Decrees forever terminating parental rights are in the category of cases in which the state may not "bolt the door to equal justice." M.L.B, 519 U.S. at 124, 117 S.Ct. at 568, 136 L.Ed.2d at 493.
Having or not having a court-appointed counsel when a parent is facing the termination of parental rights affects a fundamental right, and not having counsel impairs the exercise of that fundamental right. K.A.S., 499 N.W.2d at 565. Therefore, we will apply a strict scrutiny analysis.
A law will not survive strict scrutiny unless it is necessary to promote, and is narrowly tailored to serve, a compelling state interest. Shephard, 152 Ill.2d at 500, 178 Ill.Dec. 724, 605 N.E.2d 518. Thus, we must determine whether the classification of failing to provide court-appointed counsel to indigent parents facing involuntary termination in proceedings under the Adoption Act, while providing counsel to similarly situated parents under the Juvenile Court Act, is necessary to promote a compelling state interest and narrowly tailored to serve that interest.
Here, we can find no compelling state interest in denying an indigent parent counsel in proceedings to involuntarily terminate parental rights under the Adoption Act while affording counsel to indigent parents facing termination under the Juvenile Court Act. The state undoubtedly has a legitimate pecuniary interest in providing counsel in as limited a number of cases as possible. However, it cannot be said that the state's interest is significant enough to overcome a parent's "commanding" interest in the "accuracy and justice of the decision to terminate his or her parental status." Lassiter, 452 U.S. at 27-28, 101 S.Ct. at 2160, 68 L.Ed.2d at 650.
Where a statute is defective on equal protection grounds because of a constitutionally underinclusive scheme, a court may extend the coverage of the statute to include those who are aggrieved by the exclusion. Heckler v. Mathews, 465 U.S. 728, 738, 104 S.Ct. 1387, 1394-95, 79 L.Ed.2d 646, 656 (1984). We also note that section 2.1 of the Adoption Act provides that the Adoption Act and Juvenile Court Act should be construed in concert with one another. 750 ILCS 50/2.1 (1998). Accordingly, to avoid a constitutional defect, we will construe the Adoption Act as requiring the same procedural safeguards required by the Juvenile Court Act in cases where indigent parents are facing the involuntary termination of their parental rights. Since the orders terminating the respondent's parental rights were obtained without affording her counsel, the trial court's judgments must be reversed and the cause remanded for a new hearing on the petitions for adoption at which the respondent shall be represented by counsel *1081 if she so requests and establishes her indigence.
The respondent next argues that the trial court erred in allowing the petitioners to prosecute the proceeding to terminate her parental rights. She contends that there is no statutory authority allowing a private individual to prosecute such proceedings and that our recent decision in In re D.S., 307 Ill.App.3d 249, 240 Ill.Dec. 464, 717 N.E.2d 557 (1999), suggests that only the state can prosecute such a proceeding.
The respondent's argument must be rejected. Section 5 of the Adoption Act provides that a proceeding to adopt a child shall be commenced by the filing of a petition to adopt and that the petition list the "full names of the petitioners." 750 ILCS 50/5(A), (B)(a) (West 1996). Section 5 further provides that, if the adoption is nonconsensual, the petition must allege that the person with the authority to consent is an unfit person and the ground therefor. 750 ILCS 50/5(B)(j) (West 1998). The Adoption Act also vests the trial court with the authority to terminate the parental rights of a parent and enter an order of adoption. See 750 ILCS 50/13(B)(d), 14, 17 (West 1998). We believe that the statutory language of the Adoption Act clearly evinces an intent by the legislature to allow private parties to file and prosecute such petitions.
Unlike the Juvenile Court Act, the Adoption Act does not require the filing of a petition in respect of a minor to be filed "through the State's Attorney." 705 ILCS 405/2-13(1) (1998). In re D.S., cited by the respondent, is not helpful to her position. There, we simply held that the trial court could order the state to prosecute a petition to terminate parental rights filed by a private party under the Juvenile Court Act and that only the State had the authority to prosecute such petitions filed under that act. In re D.S., 307 Ill.App.3d at 255, 256, 240 Ill.Dec. 464, 717 N.E.2d 557. In contrast, the petition to adopt in this case, which requested the termination of parental rights, was filed under the Adoption Act. Accordingly, we conclude that the trial court did not err in allowing the petitioners to prosecute their petitions in this case.
The respondent next argues that her due process rights were violated when she was not provided, at the government's expense, a court reporter at the hearings to terminate her parental rights. She relies upon M.L.B., 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473, to support her position.
In M.L.B., a Mississippi chancery court terminated the mother's parental rights in an adoption proceeding. M.L.B., 519 U.S. at 106, 117 S.Ct. at 559, 136 L.Ed.2d at 481. The trial judge in that case had stated in his order, without elaboration, that the petitioners had met their burden of proof by "clear and convincing evidence." M.L.B., 519 U.S. at 108, 117 S.Ct. at 559, 136 L.Ed.2d at 482. The mother then sought to appeal the decision, but her appeal was dismissed when she could not afford to pay the record preparation fee required by state law. M.L.B., 519 U.S. at 106, 117 S.Ct. at 559-60, 136 L.Ed.2d at 481. Relying upon procedural due process and equal protection principles, the Supreme Court held that the state could not condition the mother's appeal on her ability to pay the record fee and that the state could not withhold from the mother "a record of sufficient completeness to permit proper [appellate] consideration of [her] claims." M.L.B., 519 U.S. at 107, 128, 117 S.Ct. at 559, 570, 136 L.Ed.2d at 481, 495.
M.L.B. is clearly distinguishable from the present case. Here, the respondent was not denied the right to appeal. Additionally, the record contains a 15-page bystander's report of the facts introduced at the hearing summarizing the testimony of the witnesses testifying at the hearing. Under the circumstances, we find the record was sufficiently complete to permit proper appellate consideration of her claims. Accordingly, we hold that the respondent's *1082 constitutional rights were not violated by the lack of a court reporter.
Our resolution of the above-discussed issues renders moot the remaining issues raised by the respondent. For the foregoing reasons, we reverse the judgments of adoption and the orders of the circuit court of Kendall County terminating the respondent's parental rights. We remand the causes for further proceedings, including a new hearing on the petitioners' petitions for adoption, at which the respondent shall be represented by counsel if she so requests and establishes her indigence.
The judgments of the circuit court of Kendall County are reversed, and the causes are remanded for further proceedings consistent with this opinion.
Reversed and remanded.
BOWMAN, P.J. and INGLIS, J., concur.