**Opinion issued April 27, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-22-00094-CV**

———————————

## IN THE INTEREST OF I.M.S. AND C.K.S., CHILDREN

---

**On Appeal from the 257th District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-49033**

---

## DISSENTING OPINION

Appellant, father, acting pro se, challenges the trial court's order, entered after a bench trial, terminating his parental rights to his minor children, I.M.S. and C.K.S. (collectively, "the children"),[1] in the private termination suit of appellees, mother

---

[1] At the time the trial court entered its order terminating father's parental rights, I.M.S. was twelve years old and C.K.S. was ten years old.

and stepfather (collectively, "appellees"). In two issues, father contends that the trial court erred in not appointing him counsel and the evidence is insufficient to support the trial court's findings that he failed to support the children in accordance with his ability during a period of one year ending within six months of the date of the filing of appellees' petition[2] and he knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and an inability to care for the children for not less than two years from the date of the filing of appellees' petition.[3]

Because the majority opinion holds that the trial court should have appointed counsel to represent father, as a matter of due process, in this private termination suit where no statutory right to appointed counsel exists and the constitution does not require it,[4] I respectfully dissent.

---

[2]     *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(F).

[3]     *See id.* § 161.001(b)(1)(Q).

[4]     *See Lassiter v. Dep't of Social Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 31 (1981) (explaining United States Constitution does not require appointment of counsel in every parental-termination proceeding); *In re B.L.D.*, 113 S.W.3d 340, 354 (Tex. 2003); *In re H.D.D.B.*, No. 01-20-00723-CV, 2022 WL 2251655, at *8–9 (Tex. App.—Houston [1st Dist.] June 23, 2022, no pet.) (mem. op.) (there is no statutory right to counsel in private termination suit and United States Constitution "does not require the appointment of counsel for parents in every parental-termination proceeding"); *In re J.C.*, 250 S.W.3d 486, 489 (Tex. App.—Fort Worth 2008, pet. denied).

## Background

Mother and father were previously married. The trial court signed a final divorce decree in May 2013.

In their petition for termination and adoption, appellees alleged that they were married, and father was the father of the children. According to appellees, termination of father's parental rights to the children was warranted because father had failed to support the children in accordance with his ability during a period of one year ending within six months of the date of the filing of their petition, father knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and an inability to care for the children for not less than two years from the date of the filing of their petition, and termination of father's parental rights was in the children's best interest. Appellees also alleged that it would be in the children's best interest for stepfather to adopt the children. Appellees requested that the trial court terminate father's parental rights to the children and permit stepfather to adopt the children.

Father answered, generally denying the allegations in appellees' petition. Father also filed a motion for appointment of counsel to represent him, asserting that he did not have "sufficient funds or assets to hire an attorney to represent [his] interest in th[e] []suit" and he was an "indigent parent." (Internal quotations omitted.) Father requested that the trial court appoint him counsel in accordance

3

with the Texas Family Code. Father also filed a "Declaration of Inability to Pay Cost," stating that he was incarcerated and "unable to pay the court cost." Appellant requested that he be allowed to "proceed in forma pauperis."[5] The trial court did not rule on father's motion to appoint counsel to represent him.[6]

At trial, mother testified that she was the children's mother and father was the children's father. The trial court signed the final divorce decree on May 31, 2013. Under mother and father's final divorce decree, father was obligated to pay $450 a month as his child support obligation, with his first payment due on June 1, 2013. Father was to have visits with the children on certain weekends during each month.

On March 31, 2017, the trial court signed an order modifying the parent-child relationship, which required father to have supervised visits with the children through Guardians of Hope—a private organization that monitors parents during

---

[5]    After trial, appellant filed an "Affidavit in Support of Request to Proceed [i]n Forma Pauperis," requesting that he be allowed to "proceed without being required to prepay fees, costs, or give security therefor."

[6]    The trial court's docket sheet, on July 22, 2021, contains a notation that father had requested court-appointed counsel, but "no court[-]appointed attorney [was] granted." *See Tex. Workers' Comp. Comm'n v. Serv. Lloyds Ins. Co.*, No. 05-99-00052-CV, 2001 WL 15961, at *9 (Tex. App.—Dallas Jan. 9, 2001, no pet.) (not designated for publication) ("A docket entry is not an order. It does not form a part of the record; it is simply a notation for the clerk's and the [trial] court's convenience. . . . The docket sheet cannot be used to show the existence of an order."); *Guyot v. Guyot*, 3 S.W.3d 243, 247–48 (Tex. App.—Fort Worth 1999, no pet.) (judge's notation on docket sheet did not preserve error for appeal); *Miller v. Kendall*, 804 S.W.2d 933, 944 (Tex. App.—Houston [1st Dist.] 1990, no writ) (docket sheet notation "does not constitute a ruling that [appellate court] may review").

4

supervised visitations. Mother testified that the reason for the change to supervised visitation between father and the children was because father had been using narcotics during his visits with the children and the children were put in dangerous situations more than once. She asserted that father did not provide a safe environment for the children to visit him; the children were "around drugs," and father was using narcotics, specifically methamphetamine and marijuana. Father also repeatedly left the children unsupervised in his home and at public swimming pools and restaurants.

According to mother, the last time that father saw the children was in June 2016. He had not spoken to the children in the last five years. He did not set up supervised visitation through Guardians of Hope. Father made a payment to Guardians of Hope but did not provide his driver's license or proof of insurance, which was required. Thus, father did not complete the registration process so that he could have supervised visitation with the children. Mother "d[id] [her] part to set up" the supervised visitation. No one at Guardians of Hope ever contacted mother to say that father wanted to have visits with the children. She was only contacted by Guardians Hope "saying [that] it wasn't going to happen."

Mother testified that at some point, possibly in 2017, she blocked father from calling her cellular telephone because she had received repeated harassing telephone calls from father, which included threats and "derogatory speech." Father called her

in the middle of the night and "all day."  She would receive "65 and 70 text messages [from father] before lunchtime."  Mother was not "able to live [her] life that way," and because father had "refused to stop," mother blocked father's telephone communication.  The harassment went on for several months before mother made the decision to block father's telephone communication.  But father could have still contacted mother through email, and if he had asked to talk to the children and "remain[ed] not irate," mother would have permitted him to speak to the children.

As to child support, mother testified that she received a payment of $650 from father on January 11, 2016, but father did not make any other child support payments in 2016.  Father also did not make any child support payments in 2017, and mother did not receive any child support payments from father in 2018, 2019, or 2020.  Mother received $1,455 on August 9, 2021 from the Office of the Attorney General, but otherwise she had not received any support from father from 2016 to 2021.  When asked whether father had provided support for the children, mother testified that he had not.  Mother also testified that father had sent the children letters and drawings, but such actions did not constitute "provid[ing] child support."

Mother stated that father was incarcerated for the offenses of possession of marijuana, aggravated robbery, and aggravated kidnapping.  Father had "robbed his grandparents at gunpoint and beat[en] them up."  During her testimony, mother viewed copies of father's judgments of conviction and explained that father had

6

pleaded guilty to the offense of "possession of over five pounds of marijuana" and was sentenced to confinement for nine years for that offense. Father also pleaded guilty to two felony offenses of "aggravated robbery with a deadly weapon, to wit: [a] firearm" and was sentenced to confinement for nine years for each offense. And father pleaded guilty to two felony offenses of aggravated kidnapping and was sentenced to confinement for nine years for each offense. The only way for mother to keep the children safe was through the termination of father's parental rights, which was in the children's best interest.

Mother further testified that she married stepfather on October 15, 2016, after dating for five years. Stepfather had known the children "that whole time"—since the time that appellees began dating. Mother stated that stepfather was a "wonderful dad" and his relationship with the children was good. The children viewed stepfather as "their dad" and had done so for many years. They loved stepfather very much, and stepfather took good care of the children. Appellees were requesting that the trial court allow stepfather to adopt the children, which mother believed was in the children's best interest.

Stepfather testified that he was married to mother and he agreed with mother's testimony as to his relationship with the children. Stepfather was asking to adopt the children if father's parental rights were terminated. Stepfather stated that he had provided the children a place to live and provided "everything that they ha[d]."

Stepfather "tr[ied] to be a father figure to them" and "guide them in a way that they[] [would] grow into decent adults." He provided for their needs. Stepfather had two other children with mother, and he viewed the children as his "own blood." Stepfather was the "father figure" in the children's life, and he would continue being a father figure for them "whatever happened."

Father testified that he was currently incarcerated, and he had been sentenced to confinement for nine years after pleading guilty to certain offenses. He was arrested in June 2018. When asked whether he had "robbed [his grandparents] at gunpoint," father stated: "That's what the conviction state[d]." But "[i]t wasn't [his] gun"; he "took [the firearm] away from [his] grandfather." Father believed that he was eligible for parole in December 2022, but if he did not receive parole, his sentence would be completed in 2027. When asked "[w]hat other criminal convictions d[id] [he] have," father responded: "I have some misdemeanors," but he could not recall the specific misdemeanor offenses of which he had been convicted.

As to child support, father testified that he did not have the ability to pay child support to mother in 2016 and 2017. He also did not make child support payments in 2018. Father was self-employed in 2016, 2017, and 2018 in the business of printing t-shirts, and he earned money from selling t-shirts, which was sometimes more than $450 a month. But father did not make child support payments because

8

he was "trying to take care of [him]self."  Since he had been incarcerated, he had not voluntarily made any child support payments.  Father noted that when he was arrested in June 2018, he was in possession of more than five pounds of marijuana, which he had purchased for personal use.  It cost him $200.  When father was asked, "who did [he] expect to put food on the table for" the children when he did not pay child support, father stated that he had expected mother to do so and he expected mother to provide clothing for the children as well.

Father had not seen the children since 2016, but he stated that he had "tried very hard to see" them.  Father agreed that after the trial court signed the March 31, 2017 order modifying the parent-child relationship, he was supposed to have supervised visitation with the children through Guardians of Hope.  Father stated that he had registered with Guardians of Hope in April 2017 and "ha[d] the receipts" saying that he had registered.  But according to father, mother "never register[ed]." Father never filed a motion with the trial court to enforce his visitation rights, and he did not have any evidence "showing a written demand to [mother] asking her to comply with Guardians of Hope . . . in some way that she [had] not."  As to the reason for supervised visitation with the children, father did not dispute mother's testimony about his narcotics use and stated that he had failed a narcotics-use test. He tested positive for methamphetamine and marijuana use.  When father used

9

narcotics, it was not in the children's best interest and he was not providing for the children when that occurred.

Father also testified that he loved the children and he cared for them. His separation from the children was not his "choosing." He was "unwilling to voluntarily release [his] parental rights." He had provided support and care for the children "to the best of [his] capabilities." While incarcerated, he sent the children gifts, books, cards, artwork, letters, and "age[-]appropriate poems." He had always been interested in "having a favorable relationship" with the children and had always intended to pay the child support amount that had accumulated. Father informed the trial court that after he was arrested his home was foreclosed upon and approximately $26,000 of excess proceeds would go to mother for child support at some indefinite point.

The trial court admitted into evidence a copy of its May 31, 2013 final divorce decree related to mother and father. The final divorce decree ordered that mother and father were appointed as joint managing conservators of the children, with mother receiving the exclusive right to designate the primary residence of the children. As to custody of the children, a standard possession order applied, allowing father to have custody of the children on the first, third, and fifth weekends during the month as long as he resided within "100 miles or less from the primary

residence of the children." Father was ordered to pay $450 as his child support obligation each month.

The trial court admitted into evidence a copy of a Financial Activity Report from the Attorney General of Texas – Child Support Division, which showed the amount father owed for child support since June 1, 2013. As of November 1, 2021, father owed $27,166.04 in overdue child support. Father made one child support payment in December 2013, in an amount less than his $450 monthly obligation. Father made certain child support payments in 2014 and 2015. In 2016, father made one payment on January 1, 2016, but no other payments that year. Father did not make any child support payments in 2017, 2019, and 2020. In 2021, mother received a child support payment on August 1, 2021.

The trial court also admitted into evidence a copy of its March 31, 2017 order modifying the parent-child relationship, finding that modification was in the children's best interest. The order removed mother and father as joint managing conservators of the children, appointed mother as the sole managing conservator of the children, with the right to designate the primary residence of the children, and appointed father as the possessory conservator of the children. The trial court found that awarding father "access to the child[ren] would not be in the best interest of the child[ren]." Thus, it ordered that father's visitation with the children would be "under the supervision of Guardians of Hope." Within ten days of the order, father

11

was required to register with Guardians of Hope. If father failed to register with Guardians of Hope within ten days, his visitation would be "ordered at the Harris County Victims Assistance Center," and father was required to contact the Harris County Victims Assistance Center to register. Father was required to pay the cost of using either Guardians of Hope or the Harris County Victims Assistance Center for his supervised visitation with the children.

Additionally, the trial court admitted into evidence copies of father's judgments of conviction. The first judgment of conviction shows that father was convicted of the third-degree felony offense of possession of marijuana on February 28, 2020. The date of the offense is listed as June 5, 2018. Father was sentenced to confinement for nine years. The second judgment of conviction shows that father was convicted of the first-degree felony offense of aggravated robbery on February 28, 2020. The date of the offense is listed as June 17, 2018. Father was sentenced to confinement for nine years. The third judgment of conviction shows that father was convicted for the first-degree felony offense of aggravated kidnapping on February 28, 2020. The date of the offense is listed as June 17, 2018. Father was sentenced to confinement for nine years. The fourth judgment of conviction shows that father was convicted of another first-degree felony offense of aggravated kidnapping on February 28, 2020. The date of the offense is listed as June 17, 2018. Father was sentenced to confinement for nine years. The fifth judgment of

conviction shows that father was convicted for another first-degree felony offense of aggravated robbery on February 28, 2020. The date of the offense is listed as June 17, 2018. Father was sentenced to confinement for nine years.

The trial court also admitted into evidence copies of several letters from mother to father, while father was incarcerated.[7] The letters state that the children are doing well and are actively involved in sports and other activities. They spend time with mother, stepfather, and their siblings on vacations, playing with pets, and growing a garden. The children play with other neighborhood kids and are healthy. Appellees are raising the children to be strong-minded, independent, humble, kind, and caring. The children are "amazing big sisters" and get along with appellees' other two children. Appellees' home is stable.

As to stepfather, the letters state that stepfather loves the children and has raised them. Stepfather has been in the children's lives since I.M.S. was two years old and C.K.S. was eleven months old. Stepfather provided for the children financially, since he and mother entered into a relationship and before they were ever married. The children consider stepfather to be "their daddy." (Internal quotations omitted.)

The letters note that the children have received the letters and artwork that father has sent to them. And they enjoy the gifts and letters. Mother states that she

---

[7] These exhibits were offered into evidence by father.

has "protected [father's] image" in the children's eyes and they do not know the details of father's life or incarceration. The children know that father loves them. But the children are not "ready" for a relationship with father, and they do not want to call or write to father.

Finally, the trial court admitted into evidence a copy of a letter from father to the children's court-appointed amicus attorney,[8] stating that father had an active relationship with the children until 2016. In 2016, father "had a battle with drug addiction," and mother did not allow any form of contact between the children and father. Since 2016, his relationship with the children "ha[d] been partial." He had tried to maintain communication with them through letters and artwork.

## Right to Counsel

In his first issue, father argues that the trial court erred when it did not appoint him counsel because the failure to appoint counsel for father, an indigent person, violated his due process rights.[9]

---

[8] This exhibit was offered into evidence by father.

[9] The majority opinion does not address whether father preserved his complaint for appellate review, which is necessary given that father did not assert in the trial court that due process required the appointment of counsel; did not obtain a ruling from the trial court on his motion to appoint counsel to represent him; and when the issue of whether father was required to have counsel was raised at trial, father did not object or otherwise complain about the trial court's failure to appoint him counsel. *See* TEX. R. APP. P. 33.1(a); *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005) ("We have held that the rules governing error preservation must be followed in cases involving termination of parental rights, as in other cases in which a complaint is based on constitutional error."); *In re B.L.D.*, 113 S.W.3d at 354 ("[D]ue process does not mandate that appellate courts review unpreserved complaints of . . . error

14

The Court reviews the trial court's decision whether to appoint counsel in a private termination suit for an abuse of discretion. *In re L.F.*, No. 02-19-00421-CV, 2020 WL 2201905, at *11 (Tex. App.—Fort Worth May 7, 2020, no pet.) (mem. op.); *see also In re I.M.M.*, No. 01-17-00415-CV, 2019 WL 1768998, at *7 (Tex. App.—Houston [1st Dist.] Apr. 23, 2019, pet. denied) (mem. op.); *In re R.J.C.*, No. 04-09-00106-CV, 2010 WL 816188, at *3 (Tex. App.—San Antonio Mar. 10, 2010, no pet.) (mem. op.) ("Whether due process calls for the appointment of counsel for indigent parents in termination proceedings is left to the sound discretion of the trial court."). To demonstrate an abuse of discretion, an appellant must show that the trial court acted arbitrarily, unreasonably, or without reference to guiding rules or principles. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

---

in parental rights termination cases."); *see also In re A.E.J.*, No. 05-20-00340-CV, 2020 WL 5107293, at *11 (Tex. App.—Dallas Aug. 31, 2020, pet. denied) (mem. op.) ("[Parent's] failure to raise a timely objection to the trial court's refusal to appoint an ad litem attorney [under Texas Family Code section 107.021] waived the issue."); *In re I.M.M.*, No. 01-17-00415-CV, 2019 WL 1768998, at *6 (Tex. App.— Houston [1st Dist.] Apr. 23, 2019, pet. denied) (mem. op.) ("[Parent] asserts that the trial court's appointment of an amicus attorney violated due process and due course of law. These arguments were not raised in the trial court, and constitutional complaints cannot be raised for the first time on appeal."); *In re V.R.P.*, No. 04-04-00431-CV, 2005 WL 1552641, at *2 (Tex. App.—San Antonio July 6, 2005, pet. denied) (mem. op.) (holding parent failed to preserve his complaint that appointment of counsel was required by Fourteenth Amendment).

Although Texas Family Code section 107.013(a) requires the trial court to appoint counsel to represent an indigent parent in a governmental-filed suit for the termination of parental rights, Texas Family Code section 107.021 provides for the discretionary appointment of counsel for an indigent parent in a private termination suit. *See* TEX. FAM. CODE ANN. §§ 107.013(a), 107.021; *In re L.F.*, 2020 WL 2201905, at \*11; *In re T.L.W.*, No. 12-10-00401-CV, 2012 WL 1142475, at \*1 (Tex. App.—Tyler Mar. 30, 2012, no pet.) (mem. op.); *see also In re H.D.D.B.*, No. 01-20-00723-CV, 2022 WL 2251655, at \*8–9 (Tex. App.—Houston [1st Dist.] June 23, 2022, no pet.) (mem. op.) (there is no statutory right to counsel in private termination suit). Stated differently, the Texas Legislature has given courts the discretion to appoint counsel for an indigent parent in a private termination suit. *In re L.F.*, 2020 WL 2201905, at \*11; *see also In re J.E.D.*, No. 11-19-00166-CV, 2019 WL 5617645, at \*3 (Tex. App.—Eastland Oct. 24, 2019, no pet.) (mem. op.) ("Although a trial court may appoint an attorney . . . to represent an indigent parent in a termination proceeding that is brought by a party other than a governmental entity, no statutory mandate exists when the suit is brought by a private party rather than a governmental entity."); *In re R.J.C.*, 2010 WL 816188, at \*3 (when termination suit is brought by other parent, no mandatory requirement that trial court appoint attorney to represent indigent parent).

Even though the appointment of counsel for an indigent parent in a private termination suit is not required by Texas statute, due process may require it. *See* U.S. CONST. amend. XIV; *In re L.F.*, 2020 WL 2201905, at *11; *In re J.E.D.*, 2019 WL 5617645, at *3; *In re R.J.C.*, 2010 WL 816188, at *3. However, the United States Supreme Court has held that due process does not require the appointment of counsel in every parental-termination proceeding and the decision is best left to the trial court. *See Lassiter v. Dep't of Social Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 31–32 (1981); *see also In re B.L.D.*, 113 S.W.3d 340, 354 (Tex. 2003); *In re H.D.D.B.*, 2022 WL 2251655, at *8–9 (United States Constitution "does not require the appointment of counsel for parents in every parental-termination proceeding"); *In re J.E.D.*, 2019 WL 5617645, at *3; *In re T.L.W.*, 2012 WL 1142475, at *1; *In re J.C.*, 250 S.W.3d 486, 489 (Tex. App.—Fort Worth 2008, pet. denied). Thus, an indigent parent's constitutional right to counsel under the Fourteenth Amendment's Due Process Clause must be determined on a case-by-case basis. *See Lassiter*, 452 U.S. at 27–32; *In re T.L.W.*, 2012 WL 1142475, at *1; *Lopez v. Kushner*, No. 03-06-00779-CV, 2008 WL 399195, at *7 (Tex. App.—Austin Feb. 13, 2008, pet. denied) (mem. op.); *see also In re J.E.D.*, 2019 WL 5617645, at *3 ("On appeal, [appellate court] look[s] at the facts and circumstances of the case to determine whether the trial court's failure to appoint counsel deprived the parent of due process."). Notably, whether due process calls for the appointment of counsel for

17

an indigent parent in a private termination suit "is left to the sound discretion of the trial court." *In re R.J.C.*, 2010 WL 816188, at *3.

In determining whether due process requires appointment of counsel for an indigent parent, the Court considers whether: (1) the petition for termination contains allegations of neglect or abuse upon which criminal charges could be based, (2) expert witnesses are involved in the case, (3) the case presents troublesome points of law, either procedural or substantive, (4) the record indicates that the absence of counsel's guidance rendered the proceedings fundamentally unfair, (5) the presence of counsel would have made a determinative difference, (6) and the indigent parent demonstrates a clear desire to contest the proceedings.[10] *See Lassiter*, 452 U.S. at 32–33; *In re L.F.*, 2020 WL 2201905, at *12; *In re T.L.W.*, 2012 WL 1142475, at *2.

Here, appellees' petition for termination did not allege that father abused or neglected the children, and father is not subject to criminal charges stemming from his relationship with the children. *See Lassiter*, 452 U.S. at 32–33; *In re L.F.*, 2020 WL 2201905, at *12 (concluding due process did not require appointment of counsel

---

[10] Father does not address these factors in his briefing and does not argue that due process required the trial court to appoint him counsel because appellees' petition for termination contained allegations of neglect or abuse; expert witnesses were involved in this case; the case presented troublesome points of law, either procedural or substantive; the absence of counsel's guidance rendered the proceedings fundamentally unfair; or the presence of counsel would have made a determinative difference. *See* TEX. R. APP. P. 38.1(i).

18

in part because termination petition "contained no allegations against [parent] upon which criminal charges could be based"); *In re T.L.W.*, 2012 WL 1142475, at \*2; *In re R.J.C.*, 2010 WL 816188, at \*4 (concluding trial court did not violate parent's right to due process by refusing to appoint him counsel where petition to terminate contained no allegations that parent abused or neglected child and parent was, thus, not subject to criminal charges stemming from his relationship with child).  Thus, father did not need counsel to assist him in protecting his privilege against self-incrimination in this case.

Second, there were no expert witnesses involved in the trial court proceedings, and there were no expert witnesses for father to cross-examine without the assistance of counsel.  *See In re L.F.*, 2020 WL 2201905, at \*12 (noting, in concluding that due process did not require appointment of counsel in private termination suit, that no expert witnesses testified); *In re T.L.W.*, 2012 WL 1142475, at \*2; *In re R.J.C.*, 2010 WL 816188, at \*4 (concluding trial court did not violate parent's right to due process by refusing to appoint him counsel where there were no expert witnesses to cross-examine).  Instead, only mother, stepfather, and father testified at trial, and all the testimony presented at trial was uncomplicated.  Father was also given the opportunity to cross-examine appellees thoroughly.  And the trial court allowed father to testify uninterrupted in a narrative form.

Third, there were no troublesome points of law to address, and there are no indications in the record that the absence of counsel amounted to fundamental unfairness. *See In re T.L.W.*, 2012 WL 1142475, at *2; *In re R.J.C.*, 2010 WL 816188, at *4. To the extent that some objectionable evidence may have been admitted at trial,[11] there is no indication that the evidence of father's multiple convictions, his failure to pay child support, or mother's and stepfather's testimony indicating that termination of father's parental rights was in the children's best interest, was inadmissible. *See In re T.L.W.*, 2012 WL 1142475, at *2; *In re R.J.C.*, 2010 WL 816188, at *4. Although counsel may have done a more thorough or succinct job in presenting father's arguments, father was able to convey to the trial court that he did not want his parental rights terminated, he loved the children, and he had attempted to contact them while he was incarcerated. *See In re V.R.P.*, No. 04-04-00431-CV, 2005 WL 1552641, at *2 (Tex. App.—San Antonio July 6, 2005, pet. denied) (mem. op.) (if parent had preserved his complaint, due process did not require appointment of counsel where parent was able to and did effectively urge his position at trial). There is no indication, based on all the evidence, that a more thorough presentation of these arguments would have made a determinative difference in the final result.[12] *See In re T.L.W.*, 2012 WL 1142475, at *2; *In re*

---

[11]    Father does not assert that any objectionable evidence was admitted at trial.

[12]    I disagree with the majority opinion's conclusions that this case presented a "troublesome point[] of law" and that had father been represented by counsel, his

*R.J.C.*, 2010 WL 816188, at \*4. Instead, the key facts in the termination of father's rights were father's commission of five felony offenses leading to an extended period of incarceration and father's failure to care and support the children for a significant portion of the children's lives. Appointed counsel would not have made a "determinative difference" regarding those key facts. *See In re L.F.*, 2020 WL 2201905, at \*13 (internal quotations omitted); *see also Lassiter*, 452 U.S. at 32–33 (in concluding parent not entitled to appointed counsel, noting evidence was sufficiently strong that counsel would not have likely made any difference); *Blakeney v. McRee*. 188 So. 3d 1154, 1160–61 (Miss. 2016) ("The assistance of

---

counsel would have "made a determinative difference" at trial. (Internal quotations omitted.) *Cf. In re T.L.W.*, No. 12-10-00401-CV, 2012 WL 1142475, at \*1–3, \*9–14 (Tex. App.—Tyler no pet.) (mem. op.) (concluding presence of counsel would not have made determinative difference in case where evidence was sufficient to support termination of parental rights); *see also Blakeney v. McRee*, 188 So. 3d 1154, 1160–61 (Miss. 2016) ("[The] decision to terminate [parent's] parental rights was supported by substantial evidence, and the presence of an attorney would not have changed the result of th[e] case."); *C.S. v. People*, 83 P.3d 627, 637 (Colo. 2004) ("[T]he simplicity of the hearing and the weight of the evidence against [parent] presented at the hearing were such that the absence of counsel did not render the proceeding fundamentally unfair."); *In re Adoption of K.L.P.*, 735 N.E.2d 1071, 1079 (Ill. App. Ct. 2000) (determining parent not denied due process and presence of counsel would not have made determinative difference where "the evidence in th[e] case was not closely balanced"). The record makes clear that this is a typical parental-rights-termination case in which the focus concerned "[father's] relationship with [his] child[ren]"—a matter on which a parent is "uniquely well informed and to which the parent must have given prolonged thought." *See Lassiter*, 452 U.S. at 29. Father has neither identified any "troublesome points of law" nor other evidence that he would have presented—or opposing evidence he would have rebutted more effectively—if he had been appointed counsel. *See* TEX. R. APP. P. 38.1(i). And these failures are fatal to his complaint.

21

counsel cannot change the fact that [parent] was convicted of murdering his wife's father in front of his children, and was sentenced to life imprisonment, and has not had a relationship with [his children] for almost a decade."); *J.C.N.F. v. Stone Cnty. Dep't of Human Servs.*, 996 So. 2d 762, 771–72 (Miss. 2008) (parent not denied due process when presence of counsel would not have precluded fact finder from finding parental rights should have been terminated); *C.S. v. People*, 83 P.3d 627, 637 (Colo. 2004) ("Given the weight of the evidence and the history of the case, there was little that a . . . court-appointed attorney could have done in th[e] hearing to turn the tide in [parent's] favor."); *K.D.G.L.B.P. v. Hinds Cnty. Dep't of Human Servs.*, 771 So. 2d 907, 911 (Miss. 2000) ("[T]he evidence supporting the [fact finder's] decision to terminate [parent's] parental rights was so overwhelming that the presence of counsel would not have changed the outcome of the trial.").

Finally, although father demonstrated a clear desire to contest the proceedings and to maintain a relationship with the children, this alone does not "tip the scales of due process" to entitle father to appointed counsel in this private termination suit. *See In re T.L.W.*, 2012 WL 1142475, at *2; *In re R.J.C.*, 2010 WL 816188, at *4.

Based on the foregoing, I cannot say that the facts and circumstances of the present case indicate that father was denied due process by the failure of the trial court to appoint counsel to represent his interests. *See In re T.L.W.*, 2012 WL

1142475, at *1–3. Thus, I would hold that the trial court did not err in failing to appoint counsel to represent father in this private termination suit.

I would overrule father's first issue.

## Sufficiency of Evidence[13]

In his second issue, father argues that the trial court erred in terminating his parental rights to the children because the evidence is insufficient to support the trial court's findings that he failed to support the children in accordance with his ability during a period of one year ending within six months of the date of the filing of appellees' petition and he knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and an inability to care for the children for not less than two years from the date of the filing of appellees' petition.[14] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(F), (b)(1)(Q).

A parent's right to "the companionship, care, custody, and management" of his children is a constitutional interest "far more precious than any property right."

---

[13]  Because the majority opinion sustains father's first issue, the majority opinion does not reach father's second issue. *See* TEX. R. APP. P. 47.1. Because I would overrule father's first issue, it is necessary to also address father's second issue.

[14]  Father also appears to argue that the trial court erred in terminating his parental rights to the children because the evidence is insufficient to support the trial court's finding that he voluntarily left the children alone or in the possession of another without providing adequate support of the children and remained way for a period of at least six months. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(C). But this argument need not be addressed because the trial court did not make such a finding and did not terminate father's parental rights on such a basis.

*Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [his] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, the Court "strictly construe[s] involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, the Court must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which the parties moving for termination bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, the Court "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and it "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). But this does not mean the Court must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, the Court must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in the analysis. *Id.* If the Court determines that no reasonable trier of fact could have formed a firm belief or conviction that the matter that must be proven is true, it must hold the evidence to be legally insufficient and render judgment in favor of the parent whose rights were sought to be terminated. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, the Court must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably

could have formed a firm conviction or belief about the truth of the matter on which the parties moving for termination bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). The Court should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

In order to terminate the parent-child relationship between father and the children, appellees, as the parties moving for termination, must have established, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of father's parental rights is in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b); *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (both elements must be established). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child[ren]'s best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Thus, if multiple predicate grounds are found by the trial court, an appellate court may affirm on any one ground because only one is necessary

26

for termination of parental rights. *See In re J. G. S.*, 574 S.W.3d 101, 115 (Tex. App.—Houston [1st Dist.] 2019, pet. denied); *In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

## A. Criminal Conviction and Confinement Without Provision of Care for Children

In a portion of his second issue, father argues that the evidence is insufficient to support the trial court's finding that he knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and an inability to care for the children for not less than two years from the date of the filing of appellees' petition because although he "cannot deny being incarcerated due to a plea bargain," "caring for the [children]" "has always been important to him" and "mere imprisonment will not stand alone." (Internal quotations omitted.) *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(Q).

Texas Family Code section 161.001(b)(1)(Q) permits termination of parental rights on clear and convincing evidence that a parent "knowingly engaged in criminal conduct that has resulted in the parent's: (i) conviction of an offense; and (ii) confinement or imprisonment and [an] inability to care for the child[ren] for not less than two years from the date of [the] filing [of] the petition." *Id.*

Section 161.001(b)(1)(Q) "fills a gap" in the bases for termination by allowing a prospective analysis of the anticipated care of the children while a parent is incarcerated and an opportunity for intervention to avoid neglect of the children

during a prolonged incarceration.  *See In re A.V.*, 113 S.W.3d at 360; *In re J. G. S.*, 574 S.W.3d at 118; *In re D.J.H.*, 381 S.W.3d 606, 612 (Tex. App.—San Antonio 2012, no pet.).  The provision exists not to mete out additional punishment on parents for their criminal conduct, but to "ensure that the child[ren] will not be neglected" while their parent is away in prison.  *In re A.V.*, 113 S.W.3d at 360; *In re J. G. S.*, 574 S.W.3d at 118; *In re A.R.*, 497 S.W.3d 500, 503 (Tex. App.—Texarkana 2015, no pet.).  Thus, if a parent is convicted and sentenced to serve at least two years' confinement and will be unable to provide for his children during that time, Texas Family Code section 161.001(b)(1)(Q) allows for the termination of parental rights to ensure that the children will not be neglected.  *In re A.V.*, 113 S.W.3d at 360; *In re A.R.*, 497 S.W.3d at 503.  The primary focus of section 161.001(b)(1)(Q)—like section 161.001 generally—is the protection of the children's best interests.  *In re A.V.*, 113 S.W.3d at 360; *In re J. G. S.*, 574 S.W.3d at 118.

The requirement of clear and convincing evidence of an "inability to care for the child[ren]" is not met on the mere showing of prolonged incarceration.  *In re J. G. S.*, 574 S.W.3d at 118; *In re D.J.H.*, 381 S.W.3d at 611 n.3.  "Otherwise, the termination of parental rights could become an additional punishment automatically imposed along with imprisonment for almost any crime."  *In re E.S.S.*, 131 S.W.3d 632, 639 (Tex. App.—Fort Worth 2004, no pet.); *see also In re J. G. S.*, 574 S.W.3d

28

at 118. Therefore, evidence of a two-year incarceration is only the first of a three-step analysis. *In re J. G. S.*, 574 S.W.3d at 118.

In the first step, the parties moving for termination must produce evidence of criminal conduct by the incarcerated parent that results in confinement for two or more years. *Id.* at 119. The burden of production then shifts to the incarcerated parent. *Id.*

In the second step, the incarcerated parent must produce some evidence of how he will provide care for the children during the period of confinement or that the incarcerated parent has arranged with another person for that person to provide care for the children during the period of confinement. *Id.*

If the incarcerated parent seeks to meet the burden of production with evidence that another person will care for the children during the period of confinement, the incarcerated parent must prove the proposed caregiver's agreement to provide the care. *Id.*; *In re E.S.S.*, 131 S.W.3d at 640 ("[Incarcerated parent] met his burden of production regarding how he would arrange for the care of [child] in that the agreement reached by the parties included naming [parent's] mother and brother possessory conservators with visitation rights.").

The Texas Supreme Court has held that an incarcerated parent relying on another's provision of care to avoid termination under Texas Family Code section 161.001(b)(1)(Q) must demonstrate that the care is being provided on behalf of the

parent, not out of an existing duty or inclination to care for the children. *In re H.R.M.*, 209 S.W.3d at 110–11; *see also In re J. G. S.*, 574 S.W.3d at 119; *In re D.L.A.*, No. 04-18-00182-CV, 2018 WL 4412506, at *9 (Tex. App.—San Antonio Sept. 18, 2018, pet. denied) (mem. op.) ("The care must be offered by a person who agrees to assume the incarcerated parent's obligation to care for the child[ren] during the incarceration."); *cf. In re I.G.*, No. 13-18-00114-CV, 2018 WL 3062581, at *4 (Tex. App.—Corpus Christi–Edinburg June 21, 2018, no pet.) (mem. op.) (holding grandparents' care as part of "working relationship" with incarcerated parent met parent's burden). An incarcerated parent cannot meet his burden merely by producing evidence that there is a non-incarcerated parent or grandparent who is willing and able to care for the children; instead, the incarcerated parent must present evidence that the alternative caregiver is providing care on behalf of the incarcerated parent. *In re H.R.M.*, 209 S.W.3d at 110–11; *see also In re J. G. S.*, 574 S.W.3d at 119; *In re D.Z.R.-M.*, No. 14-13-01084-CV, 2014 WL 1390289, at *9 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (holding evidence of aunt's care did not meet incarcerated parent's burden because aunt's care was "on her own behalf, rather than agreeing to assume the [parent's] obligation to care for the [c]hild while the [parent was] incarcerated").

If the incarcerated parent's burden of production is met, the third step shifts the burden to the parties seeking to terminate the parental rights of the incarcerated

30

parent. *In re J. G. S.*, 574 S.W.3d at 119–20; *In re S.R.*, No. 13-15-00114-CV, 2015 WL 3657747, at *2 (Tex. App.—Corpus Christi–Edinburg June 11, 2015, no pet.) (mem. op.). Those parties then have the burden of persuasion to show by clear and convincing evidence that the incarcerated parent's provision or arrangement would not adequately satisfy the incarcerated parent's duty to the children. *In re J. G. S.*, 574 S.W.3d at 120; *In re S.R.*, 2015 WL 3657747, at *2; *In re D.J.H.*, 381 S.W.3d at 611 n.3.

Appellees, as the parties moving to terminate father's parental rights, had the initial burden to show that father had been confined for more than two years since the date they petitioned to terminate his parental rights to the children.[15]

On February 28, 2020, father pleaded guilty and was convicted of the felony offense of possession of marijuana, two felony offenses of aggravated robbery, and two felony offenses of aggravated kidnapping. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121(a) ("[A] person commits [the] offense [of possession of marijuana] if the person knowingly or intentionally possesses a usable quantity of [marijuana]."); TEX. PENAL CODE ANN. §§ 20.04(a) ("[A] person commits [the] offense [of aggravated kidnapping] if he intentionally or knowingly abducts another

---

[15] Father does not appear to assert in his briefing that appellees, as the parties moving for termination, failed to meet their initial burden nor does father appear to dispute that he knowingly engaged in criminal conduct that resulted in his incarceration for at least two years from the date of the filing of appellees' petition. *See* TEX. R. APP. P. 38.1(i).

person . . . ."), 29.03(a) ("A person commits [the] offense [of aggravated robbery] if he commits robbery as defined in [Texas Penal Code] [s]ection 29.02 . . . ."); *see also id.* § 29.02(a) ("A person commits [the] offense [of robbery], if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he: (1) intentionally[] []or knowingly . . . causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death."); *In re G.S.*, No. 02-19-00390-CV, 2020 WL 1294925, at *4–5 (Tex. App.—Fort Worth Mar. 19, 2020, pet. denied) (mem. op.) (holding evidence sufficient to support trial court's finding that incarcerated parent knowingly engaged in criminal conduct that resulted in his conviction and confinement, where parent pleaded guilty to offense of aggravated robbery); *In re H.O.*, 555 S.W.3d 245, 248–49, 251 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (noting trial court found incarcerated parent knowingly engaged in criminal conduct that resulted in his conviction and confinement and terminated parental rights, where parent pleaded guilty to offense of possession of controlled substance). For each offense, father was sentenced to confinement for nine years, with the sentences to run concurrently. Father admitted that he was currently incarcerated, and he had been sentenced to confinement for nine years after pleading guilty to certain offenses. He had been incarcerated since June 2018—when he was arrested. Father testified that he

believed he was eligible for parole in December 2022,[16] but if he did not receive parole, he would remain incarcerated until 2027. Appellees filed their petition for termination on August 17, 2020, and father still had more than two years' confinement remaining at that time. Thus, I would conclude that appellees met their initial burden of establishing a two-year period of confinement following a conviction. *See In re J. G. S.*, 574 S.W.3d at 119.

---

[16] *See In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (stating parent's testimony concerning his parole eligibility was "barely more than conjecture"); *In re J.L.V.*, No. 09-19-00316-CV, 2020 WL 1161098, at *8 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.) ("[Incarcerated parent's] testimony about parole [was] mere speculation and [did] not prevent [the] factfinder from forming a firm belief or conviction that he would be incarcerated for longer than two years . . . ."); *In re H.O.*, 555 S.W.3d 245, 252 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("Although the availability of parole is relevant to determining whether a parent will be released from confinement within two years of the filing of a termination petition, [m]ere introduction of parole-related evidence . . . does not prevent a factfinder from forming a firm conviction or belief that the parent will remain incarcerated for at least two years" (first alteration in original) (internal quotations omitted)); *In re K.R.L.*, No. 14-10-00187-CV, 2010 WL 4069351, at *6 (Tex. App.—Houston [14th Dist.] Oct. 19, 2010, no pet.) (mem. op.) (explaining although incarcerated parent anticipated early release, his belief was speculative, and he provided no documentation to trial court to support his belief). Here, father's testimony recognized that there was no guarantee that he would be granted parole, and father presented no evidence to support his belief that he would receive parole in December 2022. *See In re H.O.*, 555 S.W.3d at 252–53 (evidence sufficient to support trial court's finding that parent would remain incarcerated two years from date termination petition filed, although father presented evidence that he would be eligible for parole). Further, even if father did receive parole in December 2022, appellees filed their petition to terminate father's parental rights on August 17, 2020, and father still had more than two years' confinement remaining at that time. *See In re J. G. S.*, 574 S.W.3d 101, 120 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

33

Because appellees met their initial burden, the burden shifted to father to produce some evidence of his ability to care for the children during his period of incarceration or an agreement from another to provide care for the children on his behalf. *See id.* at 121. Father asserts in his briefing that "caring for the [children]" "has always been important to him." But father failed to produce any evidence at trial that he was able to care for the children during his period of confinement, and father did not present any evidence of an agreement from another to provide care for the children on his behalf. *See In re B.D.A.*, 546 S.W.3d 346, 358 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("The record demonstrates that [incarcerated parent] ha[d] not adequately cared for or supported the children and that he ha[d] made no arrangements for their care during his incarceration . . . . He did not make any efforts to produce some evidence as to how he would provide or arrange to provide care for the children during his incarceration."); *see also In re A.T.M.*, No. 13-21-00008-CV, 2021 WL 2584402, at *10 (Tex. App.—Corpus Christi–Edinburg June 24, 2021, no pet.) (mem. op.) ("There was no evidence that any person had ever taken care of the child on [incarcerated parent's] behalf in the past, nor was there any evidence that any person would be able to adequately care for the child on [incarcerated parent's] behalf in the future."). Instead, when asked "who did [he] expect to put food on the table for" the children, father stated that he had expected mother to do so, and father stated that he expected mother to provide clothing for the

34

children as well. *Cf. In re H.R.M.*, 209 S.W.3d at 110 (evidence mother cared for child "d[id] not show that she agreed to care for [child] on [incarcerated parent's] behalf, particularly where . . . she [was] seeking to terminate [incarcerated parent's parental rights]" (emphasis omitted)); *see also In re R.K.P.-R.*, No. 10-21-00265-CV, 2022 WL 172381, at *3 (Tex. App.—Waco Jan. 19, 2022, pet. denied) (mem. op.) ("Cases discussing the incarcerated parent's provision of support through other people contemplates that the support will come from the incarcerated parent's family or someone[, other than the non-incarcerated parent,] who has agreed to assume the incarcerated parent's obligation to care for the child." (internal quotations omitted)).

To the extent that father relies on the evidence that he sent the children gifts, books, cards, artwork, letters, and "age[-]appropriate poems" while incarcerated, as proof of his "support," I note that father also admitted that he had not voluntarily made any child support payments since he had been incarcerated. Although, when deciding whether an incarcerated parent is able to care for the children, a court may consider the availability of both financial and emotional support from the incarcerated parent, participation in a child's life through letters is not always enough, particularly given the history in this case of father's general absence from the children's lives. *See Brazoria Cnty. Children's Protective Servs. v. Frederick*, 176 S.W.3d 277, 279–80 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (although

35

parent sent birthday cards to child while incarcerated, in considering incarcerated parent's ability to provide emotional support, noting parent had not spent significant amount of time with child prior to incarceration); *In re B.M.R.*, 84 S.W.3d 814, 818–19 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (although incarcerated parent testified that he "would participate in [his] child's life through letters and phone calls," noting parent, prior to incarceration, rarely saw child, failed to utilize his numerous visitation opportunities afforded to him in divorce decree, and parent had history of making little contact with his other children); *see also In re A.G.D.*, No. 07-15-00201-CV, 2016 WL 316879, at *4 (Tex. App.—Amarillo Jan. 22, 2016, no pet.) (mem. op.) (noting "care" not defined in Texas Family Code section 161.001(b)(1)(Q) and explaining "courts have interpreted it to encompass both financial and emotional support"); *In re J.L.V.*, No. 09-19-00316, 2020 WL 1161098, at *6–8 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.) (although incarcerated parent testified "he sent some letters and cards" to child and "he wanted to provide emotional support to [child] and be present in his life," holding evidence sufficient "to show that [parent's] incarceration would prevent [him] from caring for [child] and [parent] had not provided care for [child] while he was incarcerated"). Here, the undisputed evidence shows that father had not seen the children since June 2016—more than two years before he was incarcerated. In 2017, father was removed as a joint managing conservator of the children and

36

required to participate in supervised visitation through Guardians of Hope, but that visitation never occurred. Despite the fact that father was required to make a $450 child support payment every month since June 1, 2013, father only made one payment in 2013, in an amount less than his $450 monthly obligation. Further, mother only received one $650 child support payment from father in 2016, and no child support payments from father in 2017, 2018, 2019, and 2020. The copies of the several letters sent by mother to father, during father's incarceration, indicated that the children were not "ready" for a relationship with father, and did not want to call or write to father.[17] To the extent that the children like receiving letters and gifts from father—although the record is not clear on how often this occurs—the evidence presented at trial does not demonstrate an ability by father to provide consistent care to the children or fulfill his responsibility to care for the children while he is incarcerated. *See In re H.P.*, No. 07-19-00394-CV, 2020 WL 2107810, at *4 (Tex. App.—Amarillo May 1, 2020, pet. denied) (mem. op.) (although incarcerated parent testified he provided Christmas gifts to child "through the Angel Tree Foundation," evidence did not demonstrate ability to provide consistent care for child and did not fulfill parent's responsibility to care for child while incarcerated); *In re G.S.*, 2020 WL 1294925, at *5 (holding evidence sufficient to support trial court's finding that parent was unable to care for child while incarcerated, even where incarcerated

---

[17] Father offered copies of these letters into evidence at trial.

37

parent testified he wrote to child weekly, sent child gifts, and did "everything [he] possibly could from prison" (internal quotations omitted)).

I would conclude that father did not meet his burden to produce evidence of an ability to support the children while incarcerated or an agreement with another person to care for the children on father's behalf. Thus, appellees had no burden to prove that the arrangement proffered by father would not satisfy his duty to the children. *See In re H.O.*, 555 S.W.3d at 253.

Viewing the evidence in the light most favorable to the trial court's finding, I would conclude that the trial court could have formed a firm belief or conviction that father knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and father had an inability to care for the children for not less than two years from the date of the filing of appellees' petition. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(Q). And, viewing the evidence in a neutral light, I would conclude that a reasonable fact finder could have formed a firm belief or conviction that father knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and father had an inability to care for the children for not less than two years from the date of the filing of appellees' petition. *See id.*

Further, I would conclude that the trial court could have reconciled any disputed evidence in favor of a finding that father knowingly engaged in criminal

conduct that resulted in his conviction of an offense and confinement or imprisonment and father had an inability to care for the children for not less than two years from the date of the filing of appellees' petition. And any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that father knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and father had an inability to care for the children for not less than two years from the date of the filing of appellees' petition.

Accordingly, I would hold that the evidence is legally and factually sufficient to support the trial court's finding that father knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and father had an inability to care for the children for not less than two years from the date of the filing of the petition. *See id.*

Thus, I would overrule this portion of father's second issue.

As previously noted, only one predicate finding under Texas Family Code section 161.001(b)(1) is necessary to support termination of father's parental rights to the children. *See In re A.V.*, 113 S.W.3d at 362. Accordingly, because I would hold that the evidence is legally and factually sufficient to support the trial court's finding, under Texas Family Code section 161.001(b)(1)(Q), that father knowingly engaged in criminal conduct that resulted in his conviction of an offense and

confinement or imprisonment and father had an inability to care for the children for not less than two years from the date of the filing of appellees' petition, it is not necessary to address the remaining portion of father's second issue challenging the trial court's finding under Texas Family Code section 161.001(b)(1)(F), i.e., that father failed to support the children in accordance with his ability during a period of one year ending within six months of the date of the filing of appellees' petition. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(F); *In re A.V.*, 113 S.W.3d at 362; *In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at \*16 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.); *see also* TEX. R. APP. P. 47.1.

## B.    Best Interest of Children

In his notice of appeal, appellant stated that he sought to "challenge the [trial court's] best interest finding[]," but in his appellant's brief, appellant does not argue that trial court erred in terminating his parental rights to the children because the evidence is insufficient to support the trial court's finding that termination of his parental rights was in the children's best interest.  Father makes no reference to the trial court's best-interest finding at all.

The Court reviews the arguments actually raised and briefed on appeal.  *See* TEX. R. APP. P. 38.1; *Klentzman v. Brady*, 312 S.W.3d 886, 889 (Tex. App.— Houston [1st Dist.] Dec. 31, 2009, no pet.).  An appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to

authorities and to the record." TEX. R. APP. P. 38.1(i). A pro se appellant bears the burden of discussing his assertions of error. *See Yoonessi v. D'Arcy*, No. 05-07-00689-CV, 2008 WL 4981631, at *1 (Tex. App.—Dallas Nov. 25, 2008, pet. denied) (mem. op.). Although the Court construes pro se pleadings and briefs liberally, it holds pro se litigants to the same standards as licensed attorneys and requires them to comply with applicable laws and rules of procedure. *See Garrett v. Lee*, No. 01-21-00498-CV, 2021 WL 5702177, at *2 (Tex. App.—Houston [1st Dist.] Dec. 2, 2021, pet. denied) (mem. op.); *In re N.E.B.*, 251 S.W.3d 211, 211–12 (Tex. App.—Dallas 2008, no pet.); *see also Hopes-Fontenot v. Farmers New World Life Ins. Co.*, No. 01-12-00286-CV, 2013 WL 4399218, at *1 (Tex. App.—Houston [1st Dist.] Aug. 15, 2013, no pet.) (mem. op.) (pro se litigant must properly present his case on appeal; appellate court "may not make allowances or apply different standards for litigants appearing without . . . counsel"). A failure to provide substantive analysis of an issue or cite appropriate authority waives a complaint on appeal. *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 75 (Tex. App.—San Antonio 2011, no pet.); *Washington. v. Bank of N.Y.*, 362 S.W.3d 853, 854–55 (Tex. App.—Dallas 2012, no pet.); *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.) ("[The Court] ha[s] no duty to brief appellant's issue for [him]. Failure to cite to applicable authority or provide substantive analysis waives an issue on appeal.").

To the extent that father has attempted to raise a complaint on appeal related to the trial court's finding that termination of father's parental rights was in the children's best interest, I would hold that father has waived his complaint because it is inadequately briefed. *See Strange v. Cont'l Cas. Co.*, 126 S.W.3d 676, 677–78 (Tex. App.—Dallas 2004, pet. denied) (appellate court cannot remedy deficiencies in appellant's brief and argue his case for him).

## Conclusion

Although parental rights are fundamental, they are not the only rights at stake in a termination-of-parental-rights case. The children also have rights and should be afforded the chance to pursue their lives now with appellees, rather than be forced to endure more time in limbo awaiting a new trial, and another potential appeal, in this case. I would overrule both of father' issues on appeal and affirm the trial court's order terminating the parental rights of father. Because the majority opinion does otherwise, I respectfully dissent.

Julie Countiss
Justice

Panel consists of Justices Goodman, Countiss, and Farris.

Countiss, J., dissenting.

42